# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *MR. AND MRS. C, as parents and* | ) | |
| *next friends of KC, a minor,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 06-198-P-H* |
| | ) | |
| *MAINE SCHOOL ADMINISTRATIVE* | ) | |
| *DISTRICT NO. 6,* | ) | |
| | ) | |
| *Defendant* | ) | |

## RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mr. and Mrs. C, parents of student KC ("Parents"), challenge a decision of a Maine Department of Education ("MDOE") hearing officer ("Hearing Officer") issued pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its state-law analogue, 20-A M.R.S.A. § 7001 *et seq.*, to the extent that the Hearing Officer determined that (i) after April 10, 2006, the defendant Maine School Administrative District No. 6 ("MSAD No. 6" or "District") provided KC a free appropriate public education ("FAPE"), (ii) after April 10, 2006, MSAD No. 6 was not in violation of the so-called "stay put" requirement, and (iii) an award of ten weeks of summer camp adequately compensated KC for denials of FAPE found to have occurred from February 1 through April 10, 2006.  *See* Plaintiffs['] Memorandum of Law ("Parents' Brief") (Docket No. 21) at 1-2, 34; Complaint (Injunctive Relief Requested) ("Complaint") (Docket No. 1) ¶¶ 1, 58-60; Special Education Due Process Hearing [Decision], *[C] v. MSAD #6*, Case No. 06.024AH (Me.

Dep't of Educ. Aug. 17, 2006), Record, Vol. IV at 1106-67 ("Hearing Decision"), at 62.[1]  After careful review of the voluminous record filed in this case and the parties' memoranda of law, I propose that the court adopt the following findings of fact and conclusions of law, on the basis of which I recommend that the Parents' appeal be granted in part and denied in part.

## I.  Proposed Findings of Fact

1.      At the time of the MDOE hearing, KC, born April 4, 1989, was seventeen years old, stood about five feet six inches tall and weighed approximately 170 pounds.  Hearing Decision at 4, ¶ 1; Record, Vol. I at 257; Testimony of Carla Turner ("*Turner*"), Transcript, Day 3 of Due Process Hearing, *[C] vs SAD #6*, Case No. 06.024AH, Record, Vol. V at 1359-1449 ("Day 3 Transcript"), at 138.[2]  He was in the tenth grade at Bonny Eagle High School ("BEHS"), part of MSAD No. 6, having been educated in MSAD No. 6 schools since kindergarten.  Hearing Decision at 4, ¶ 1; Testimony of Mrs. C ("*Mrs. C*"), Transcript, Day 1 of Due Process Hearing, *[C] vs SAD #6*, Case No. 06.024AH, Record, Vol. V at 1194-1282 ("Day 1 Transcript"), at 80, 90.   KC, diagnosed with autism, speech/language disorder and mental retardation, had been receiving special-education services since he began public education.  Record, Vol. I at 298.

2.      KC's autism causes diminished motor, social, coping and verbal skills.  Hearing Decision at 4, ¶ 2; Record, Vol. I at 267-68; *Mrs. C*, Day 1 Transcript at 75-76; Testimony of Dr. Laura Neally Pershouse ("*Pershouse*"), Day 1 Transcript at 110-11.  He is particularly sensitive to touch, sounds and excessive visual stimuli, all of which provoke emotional responses.  Hearing Decision at 4, ¶ 2; Record, Vol. I at 267; *Pershouse*, Day 1 Transcript at 119.  He requires repetition

---

[1] Here and hereafter, page references to the Hearing Decision are to the actual page numbers appearing at the bottom of that decision.
[2] I have drawn my proposed facts from the Hearing Officer's findings to the extent relevant and supported by a preponderance of the evidence of Record, supplementing those findings with additional Record information, including facts proposed by the Parents and the District, to the extent those proposed facts are (i) relevant , (ii) factual in nature rather than argumentative, (iii) supported by a preponderance of the evidence and (iv) not inconsistent with facts supportably found by the Hearing Officer.

of routine and has unpredictable moods. Hearing Decision at 4, ¶ 2; *Pershouse*, Day 1 Transcript at 121-22. His limited coping skills make it difficult for him to deal with change, disappointment and excitement. Hearing Decision at 4-5, ¶ 2; Testimony of Holly Marston ("*Marston*"), Day 1 Transcript at 69-70; *Pershouse*, Day 1 Transcript at 111. He exhibits anxiety by speaking loudly or yelling, engaging in repetitive self-talk (technically called echolalia) and speaking to himself out loud. Hearing Decision at 5, ¶ 2; Record, Vol. I at 260; *Marston*, Day 1 Transcript at 59; *Mrs. C*, Day 1 Transcript at 77. He also throws objects, such as pencils and his glasses, when expressing frustration. Hearing Decision at 5, ¶ 2; *Marston*, Day 1 Transcript at 57-58; *Turner*, Day 3 Transcript at 100, 121.

3.      KC communicates verbally and likes to socialize with others. *Turner*, Day 3 Transcript at 96, 99. He is a social and outgoing teenager who is charming and polite and who generally wins people over. Hearing Decision at 5, ¶ 3; *Mrs. C*, Day 1 Transcript at 79; *Pershouse*, Day 1 Transcript at 109; *Turner*, Day 3 Transcript at 99. He is usually a fun student in the classroom. Hearing Decision at 5, ¶ 3; *Turner*, Day 3 Transcript at 99.

4.      KC functions well in home and community settings, including after-care provided by his grandparents and community-based services focusing on activities of daily living, without resorting to any aggressive behaviors. *Marston*, Day 1 Transcript at 56-58; *Mrs. C*, Day 1 Transcript at 76, 79.

5.      Although KC was classified as a tenth-grade student during the 2005-06 school year, he was unable to complete academic work anywhere near his nominal grade level. Record, Vol. I at 259-60. KC performs at a kindergarten to third-grade academic level. Hearing Decision at 5, ¶ 4; Record, Vol. I at 253. His cognitive ability is within the moderate range of mental retardation. Hearing Decision at 5, ¶ 4; Record, Vol. I at 262. He has consistently required support to maintain

attention and complete activities and is easily distracted.  Hearing Decision at 5, ¶ 4; Record, Vol. I at 260.

6.      In four incidents during KC's sixth-grade year involving educational technician Melody Price, KC grabbed her and pulled her to the floor and/or slapped her, pushed her, punched her or chased her.  Hearing Decision at 5, ¶ 5; Record, Vol. II at 366-70; *Turner*, Day 3 Transcript at 142-43.[3]  Price subsequently requested a change of classroom because of her fear of KC.  Hearing Decision at 5, ¶ 5; Testimony of Jennifer Donlon ("*Donlon*"), Transcript, Day 5 of Due Process Hearing, *[C] vs SAD #6*, Case No. 06.024AH, Record, Vol. VI at 1542-1625 ("Day 5 Transcript"), at 9-11.

7.      Nonetheless, in general, KC enjoyed middle school and was successful there.  Hearing Decision at 5, ¶ 6; *Mrs. C*, Day 1 Transcript at 81-82, Transcript, Day 2 of Due Process Hearing, *[C] vs SAD #6*, Case No. 06.024AH, Record, Vol. V at 1283-1358 ("Day 2 Transcript"), at 89.  He participated in some mainstream classes (including science, health, music and art) and had no significant behavioral incidents during his seventh or eighth grade years.  *Mrs. C*, Day 1 Transcript at 81-82; *Turner*, Transcript, Day 4 of Due Process Hearing, *[C] vs SAD #6*, Case No. 06.024AH, Record, Vol. VI at 1450-1541 ("Day 4 Transcript"), at 111.  He continues to speak fondly of his middle-school teachers.  Hearing Decision at 5, ¶ 6; *Turner*, Day 4 Transcript at 115-16.

8.      In September 2004 KC began ninth grade at BEHS in the Therapeutic Life Skills program with special-education teacher Carla Turner in Room 120.  Hearing Decision at 5, ¶ 7; *Mrs. C*, Day 1 Transcript at 82-83; *Turner*, Day 3 Transcript at 69-72.  Turner is a certified special-education teacher with more than twenty-five years' experience.  *Turner*, Day 3 Transcript at 64-65.

---

[3] The Hearing Officer mistakenly found there had been three such incidents.  *See* Hearing Decision at 5, ¶ 5.

9.      The special-education suite at BEHS includes Room 120, a small room enclosed within Room 120 (the quiet room), an administrative suite (Room 121) and a small office with an entry off the hallway outside Room 120 (Room 120A).  Hearing Decision at 6, ¶ 8; Record, Vol. II at 380; *Turner*, Day 3 Transcript at 73-75.

10.      When KC began ninth grade, no one-on-one educational technician was assigned to him, although several educational technicians were assigned to Turner's classroom.  Hearing Decision at 6, ¶ 9; *Turner*, Day 3 Transcript at 90-91.  He usually approached his academic work in Turner's class enthusiastically, *Turner,* Day 4 Transcript at 78-79, and typically produced many more academic assignments than other students in the Therapeutic Life Skills program, Hearing Decision at 6, ¶ 9; *Turner*, Day 3 Transcript at 98.  He normally would complete forty to forty-five assignments per quarter in both math and English, the two academic subjects on which he focused.  Hearing Decision at 6, ¶ 9; *Turner*, Day 3 Transcript at 98-99, 112-13.  He often selected the quiet room for academic work that required reading and writing, routinely spending up to fifty percent of his individual academic work time in the quiet room.  Hearing Decision at 6, ¶ 9; *Turner*, Day 3 Transcript at 96, Day 4 Transcript at 218-19.

11.      When KC started ninth grade, Turner and Mrs. C had a friendly relationship.  Hearing Decision at 6, ¶ 10; *Mrs. C*, Day 2 Transcript at 101-02.  They worked together to further KC's education and saw each other socially on a few occasions.  *Id*.

12.      KC's individualized education plan ("IEP") for the period from February 4, 2005 to February 3, 2006 ("2005-06 IEP") called for him to be educated in the Therapeutic Life Skills classroom for all of his life-skills and core classes and to receive occupational-therapy consultation, speech therapy and one-on-one support.  Hearing Decision at 6, ¶ 11; Record, Vol. II at 330.  Pupil Evaluation Team ("PET") minutes noted concerns about his "behavioral outbursts due to anxiety" as

well as his "access to mainstream peers [and] friends." *Id*. However, the IEP listed his behavioral needs as "N/A." Record, Vol. II at 330. The 2005-06 IEP called for direct instruction from the special-education teacher for three daily blocks of eighty-four minutes each as well as assistance from an educational technician for two daily blocks. Hearing Decision at 47; Record, Vol. II at 330. In addition, KC was to receive speech therapy for one hour a week and an occupational-therapy consultation for fifteen minutes a week. *Id*. The IEP stated that although KC needed a small, quiet environment in which to undertake his life-skills training and core classes in the special-education class, he would participate in mainstream classes twenty-five percent of the time. *Id*. Although the mainstream classes were not specified, testimony indicated that they were health, physical education and art. Hearing Decision at 47; *Mrs. C*, Day 2 Transcript at 92-93.[4] KC's goals included developing basic computer skills, learning to tell time, count money and measure; improving his independent living skills in the areas of cooking and appliance use; improving his comprehension and writing skills to demonstrate greater independence; and improving his language competence. Hearing Decision at 47-48; Record, Vol. II at 334-37, 339. The 2005-06 IEP also included a detailed Transition Planning Form for purposes of preparing KC for life after high school. Record, Vol. II at 342.

13. On April 8, 2005 KC tipped over a computer and keyboard in the quiet room after experiencing frustration with a spelling test that he was being asked to type rather than handwrite. Hearing Decision at 6-7, ¶ 12; *Mrs. C*, Day 1 Transcript at 85-86; *Turner*, Day 3 Transcript at 89, 100. This incident, in which KC threw a pencil and his glasses and began screaming before he knocked over the computer and table it was sitting on, *Mrs. C*, Day 2 Transcript at 121-23, marked a

---

[4] Inasmuch as appears, physical education technically was not a "mainstream" class but rather an adaptive physical-education program held in the BEHS gymnasium. *See id.*; *see also* Record, Vol. II at 328. However, KC was noted to have access to peers in the mainstream via both the gymnasium and the cafeteria. *See* Record, Vol. II at 326.

dramatic escalation in KC's use of aggression when frustrated, Hearing Decision at 7, ¶ 12; *Mrs. C*, Day 1 Transcript at 90, Day 2 Transcript at 120; *Turner*, Day 3 Transcript at 100.

14.     At a PET meeting convened on April 12, 2005, the team agreed to (i) develop a rewards-and-consequences behavior plan immediately, (ii) obtain outside evaluations to try to determine why KC's outbursts had become more violent, Hearing Decision at 7, ¶ 13; Record, Vol. II at 308, 310, and (iii) provide KC with a male educational technician, Record, Vol. II at 308. Mrs. C. also agreed to seek a review of KC's medications. Hearing Decision at 7, ¶ 13; Record, Vol. II at 310. Following the incident, KC's prescription for Zoloft was increased. Hearing Decision at 7, ¶ 13; *Mrs. C*, Day 2 Transcript at 183-84. To facilitate development of a behavior plan at school, Mrs. C spent two days in KC's classroom observing him and working with Turner to explain the family's use of consequences and rewards at home. Hearing Decision at 7, ¶ 13; *Mrs. C*, Day 1 Transcript at 87. In addition, the District hired a behavioral consultant from Spring Harbor Hospital to conduct a behavioral analysis of KC. Hearing Decision at 7, ¶ 13; *Mrs. C*, Day 1 Transcript at 89-90. The consultant conducted two days of observations but did not complete a report because she relocated. *Id*. The District hired a male educational technician, Chris Leavitt, to work one-on-one with KC. *Mrs. C*, Day 1 Transcript at 90, Day 2 Transcript at 123; *Donlon*, Transcript, Day 6 of Due Process Hearing, *[C] vs SAD #6*, Case No. 06.024AH, Record, Vol. VI at 1626-85 ("Day 6 Transcript"), at 54; *see also* Record, Vol. I at 280.[5]

15.     KC did not have another major outburst until November 7, 2005, when he was in tenth grade. Hearing Decision at 7, ¶ 14; *Turner*, Day 3 Transcript at 123-24. Shortly after arriving at school that day, he asked to go into the quiet room. Hearing Decision at 7, ¶ 14; *Turner*, Day 3

---

[5] The Parents assert, in their proposed facts, that "[t]he male educational technician (ed tech) the District agreed to provide never materialized." Parents' Brief at 4, ¶ 6. As the District points out, see Defendant's Memorandum of Law ("District Brief") (Docket No. 26) at 5 n.5, this is incorrect. It is clear from the Record that the District hired Chris Leavitt to work with KC.

Transcript at 124.  However, before entering the quiet room, he turned back to the main classroom, picked up a computer and threw it on the floor while yelling, "No!"  Hearing Decision at 7, ¶ 14; Record, Vol. II at 560; *Turner*, Day 3 Transcript at 124-25.  Two of his classmates, one of whom was in a wheelchair, were in the immediate vicinity, and a third was working at the computer right next to the one KC threw to the ground.  Hearing Decision  at 7, ¶ 14; Record, Vol. II at 560; *Turner*, Day 3 Transcript at 125.  Following the incident, KC asked to go to the health clinic, which he understood to mean that a parent would come to pick him up.  Hearing Decision at 7, ¶ 14; Record, Vol. II at 560; *Mrs. C*, Day 2 Transcript at 110.

16.     On November 16, 2005 KC again threw a computer on the floor, this time in the quiet room.  Hearing Decision at 7, ¶ 15; Record, Vol. II at 319-20; *Turner*, Day 3 Transcript at 127-28.  After shouting a profanity during gym class, KC had asked for the quiet room.  *Id*.  He picked at the hair on his wrist for a few moments, a common stereotypy behavior for him, then yelled and threw his glasses.  Hearing Decision at 8, ¶ 15; Record, Vol. II at 319-20; Testimony of Mark Geren ("*Geren*"), Day 5 Transcript at 84-85.  He then stated that he wasn't feeling well.  Hearing Decision at 8, ¶ 15; Record, Vol. II at 320.  Turner asked him if she should come into the quiet room.  *Id*.  KC answered "no" and knocked over the computer and desk.  *Id*.  He then put his finger in his mouth and tried to gag himself.  *Id*.  Turner and an educational technician walked him to the clinic.  *Id*.; *see also Turner*, Day 3 Transcript at 128.

17.     KC is always very contrite after a behavioral outburst at school.  Hearing Decision at 8, ¶ 16; *Turner*, Day 3 Transcript at 128.  He often cries and says that he is sorry.  *Id*.

18.     No PET meetings were held to discuss KC's behavioral incidents in November.  Hearing Decision at 8, ¶ 17; *Mrs. C*, Day 1 Transcript at 93.  However, modifications were made to the classroom, such as removal of a giant fish tank and attachment of storage cabinets, bookcases,

computers and computer tables to the wall.  Hearing Decision at 8, ¶ 17; *Turner*, Day 3 Transcript at 128-29.

19.     On Monday, January 9, 2006 KC had another outburst that culminated in his striking Turner.  Hearing Decision at 8, ¶ 18; Record, Vol. I at 293-97.  Upon arriving in Room 120 at approximately 7 a.m. KC, who was the first student in the room, told Turner he was sick and rattled off his mother's phone number.  Hearing Decision at 8, ¶ 18; Record, Vol. I at 293.  Turner immediately phoned Mrs. C.  Hearing Decision at 8, ¶ 18; *Turner*, Day 3 Transcript at 132.  She then told KC to hang up his coat and backpack and informed him she was on the phone with his mother.  *Id*.  As she was talking to Mrs. C on the phone, KC threw a pencil.  *Id*.  Turner directed him to go to the quiet room.  *Id*.  In the quiet room, KC tried to push the computer over, but it had been bolted down.  Hearing Decision at 8-9, ¶ 18; *Turner*, Day 3 Transcript at 133-34.  He picked a chair up over his head and smashed it down into a metal cabinet.  Hearing Decision at 9, ¶ 18; *Turner*, Day 3 Transcript at 134.  Tom Anderson, a staff member who had come to the room to assist Turner, stood at the door to the quiet room, asking Turner what they should do.  Hearing Decision at 9, ¶ 18; Record, Vol. I at 294; *Turner*, Day 3 Transcript at 134.  She said she thought KC would deescalate on his own.  Hearing Decision at 9, ¶ 18; *Turner*, Day 3 Transcript at 134.  KC then bolted toward the quiet-room door at full speed but was able to get only partway out because Anderson was holding the door partly closed.  *Id*.  Turner told Anderson they should not keep KC squeezed in the door.  *Id*. As Anderson let the door swing open, KC came flying out and hit Turner's arm with his own.  *Id*.  Turner was unsure whether the contact was accidental or intentional.  Hearing Decision at 9, ¶ 18; *Turner*, Day 3 Transcript at 134-35.  Anderson and Randy Staples, a school safety officer whom Turner had called for help, restrained KC in a flat-basket hold for one to two minutes as he lay on the physical-therapy bench.  Hearing Decision at 9, ¶ 18; Record, Vol. II at 294.  Leavitt, KC's one-on-one educational

technician, had arrived and spoke soothingly to him.  *Id.*; *see also* Record, Vol. I at 227.  KC relaxed and said he wanted to go to the clinic.  Hearing Decision at 9, ¶ 18; Record, Vol. I at 294.  When asked if he was ready to go, he said yes.  Hearing Decision at 9, ¶ 18; *Turner*, Day 3 Transcript at 136.  As he sat up and started for the door, the bell rang, and Turner instructed him to sit on the physical-therapy bench to wait for the hall to clear.  Hearing Decision at 9, ¶ 18; *Turner*, Day 3 Transcript at 136-37.  KC did not usually go out into the hallways when they were busy with students going between classes.  *Id.*  When he stood up to leave a few moments later, KC leapt between the men standing around him and hit Turner on the side of the face with a two-handed karate chop.  Hearing Decision at 9, ¶ 18; *Turner*, Day 3 Transcript at 137.  Turner described the impact as very significant, knocking her off her feet and into a pegboard on the wall.  *Id.; see also Turner*, Day 3 Transcript at 139-40.  KC then sat down on Turner's instructions and put his face in his hands and his head on his knees.  Hearing Decision at 9, ¶ 18; Record, Vol. II at 294.  He then walked quietly to the clinic with Anderson, Leavitt, Staples and Turner.  *Id.*  Mrs. C arrived shortly after the incident ended to take him home.  Hearing Decision at 10, ¶ 18; Record, Vol. II at 294.  After his mother picked him up, KC was very upset and repeatedly said he was sorry.  Hearing Decision at 10, ¶ 18; *Mrs. C*, Day 1 Transcript at 96.

      20.     As a result of the January 9 incident, KC received an in-school suspension for ten days. Hearing Decision at 10, ¶ 19;  *Mrs. C,* Day 1 Transcript at 96.  Mrs. C was unhappy about the suspension.  Hearing Decision at 10, ¶ 20; *Mrs. C*, Day 1 Transcript at 96-99.  She felt that Turner had missed cues that KC was extremely anxious and that by telling him to hang up his coat and backpack and directing him to sit down until the hallway cleared, she had aggravated the situation.  Hearing Decision at 10, ¶ 20; *Mrs. C*, Day 1 Transcript at 99.  She also questioned why Turner was so close to

KC as to allow him to hit her after seeing that he was extremely agitated.  Hearing Decision at 10, ¶ 20; Record, Vol. III at 867.

21.    KC's PET met on January 10 and agreed to consult with a psychological examiner, Mary Scammon, to determine if an evaluation or outside placement were needed.  Hearing Decision at 10, ¶ 19; Record, Vol. I at 253, 275, 277.  The team also agreed that Dr. Laura Pershouse, KC's psychiatrist, would perform a safety assessment to determine KC's readiness to return to school after his suspension.  Record, Vol. I at 277; *Mrs. C*, Day 1 Transcript at 100; *Pershouse*, Day 1 Transcript at 106.

22.    As a result of the January 9 incident, Turner drafted a behavior intervention plan for KC that called for a daily schedule review at 7:15 a.m., sensory compressions in each of the four blocks during the school day, rewards for positive behavior and a full-time one-on-one educational technician.  Hearing Decision at 10, ¶ 21; Record, Vol. I at 273.

23.    KC was tutored in the District's central office during his suspension from January 12 through January 27 by Level I educational technicians.  Hearing Decision at 10, ¶ 22; Mrs. C, Day 1 Transcript at 101, Day 2 Transcript at 4-6, 15.[6]  Evaluations for KC's triennial IEP review also were completed during this time.  Hearing Decision at 10, ¶ 22; Record, Vol. I at 253.[7]

24.    On January 24, Turner, Mrs. C and KC visited the Cummings School of Spurwink as a possible private-school placement.  Hearing Decision at 11, ¶ 23; *Mrs. C,* Day 2 Transcript at 6-9.

---

[6] The Parents propose that the court find, *inter alia*, that the educational technicians who tutored KC during his suspension were insufficiently certified and not subject to direct supervision, in violation of Maine law.  *See* Parents' Brief at 6, ¶ 11.  However, the Hearing Officer declined to so find on the evidence presented, see Hearing Decision at 40 & nn. 2-3, and the Parents do not challenge that portion of her decision on appeal, *see* Parents' Brief at 19-34.

[7] As the Parents point out, KC ended up being suspended from BEHS for more than ten school days (through Friday, January 27), and Mrs. C was asked to keep him home for an additional two days (January 30-31) while the school readied a portable classroom for him on the BEHS campus.  *See* Parents' Brief at 6, ¶ 11 & 9, ¶ 18; *see also* Hearing Decision at 41 n.4.  Nonetheless, the Hearing Officer rebuffed the Parents' claim that KC was denied a FAPE during the period of his suspension, *see* Hearing Decision at 40-41, and the Parents do not challenge that portion of her decision on appeal, *see* Parents' Brief at 19-34.

Mrs. C concluded that the program was unduly restrictive and inappropriate for KC. Hearing Decision at 11, ¶ 23; *Mrs. C*, Day 2 Transcript at 8-9.

25.     The same day KC's PET reconvened. Hearing Decision at 11, ¶ 24; Record, Vol. I at 253-54. The team reviewed triennial evaluations, including an occupational-therapy evaluation, speech/language evaluation and comprehensive psychological evaluation, as well as Dr. Pershouse's safety assessment. *Id*.

26.     Scammon's psychological evaluation did not endorse any particular placement but did recommend creation of a positive support plan targeting appropriate social interaction, following directions and work completion as well as management of disappointment and development of appropriate coping skills. Hearing Decision at 11, ¶ 25; Record, Vol. I at 265. Scammon noted that KC was "compliant with a predictable and structured schedule but can become upset with unforeseen and unwanted changes." Hearing Decision at 11, ¶ 25; Record, Vol. I at 260. She also observed that there was "some delay" in KC's communications being understood on January 9, and by the time they were understood he was very agitated. Hearing Decision at 11, ¶ 25; Record, Vol. I at 261. Mrs. C believed that Scammon supported KC's immediate return to his BEHS classroom. Hearing Decision at 11, ¶ 25; *Mrs. C*, Day 2 Transcript at 8, 10. Turner and Donlon, on the other hand, believed that Scammon agreed that KC should not be returned to Room 120 unless a more detailed behavior-intervention plan was in place. Hearing Decision at 11, ¶ 25; *Turner*, Day 4 Transcript at 125-26; *Donlon*, Day 5 Transcript at 26-27.

27.     Dr. Pershouse, who had met with KC and Mrs. C in her office on January 11, stated in a brief letter dated January 23, 2006 that KC "denied any future aggressive intent" and was "safe to return to the school environment and would benefit from doing so." Hearing Decision at 11-12, ¶ 26; Record, Vol. I at 266. Dr. Pershouse later testified that she expected that KC would not act unsafely if

an adequate safety plan, which she thought was being reviewed, was in place.  Hearing Decision at 12, ¶ 26; *Pershouse*, Day 1 Transcript at 117-18.  David Lennox, Ph.D., a behavioral consultant who provided safety training for BEHS staff in the wake of the January 9 incident, testified that he believed Dr. Pershouse's safety assessment was not useful inasmuch as remorse is not a measure of whether a person will act the same way again and Dr. Pershouse did not take into account KC's potentially increased agitation level in the classroom.  Hearing Decision at 12, ¶ 27; Testimony of Dr. David Lennox ("*Lennox*"), Day 3 Transcript at 145-49, 227-28.

28.      The PET determined, among other things, that KC would "be placed in an outside placement as soon as one is selected to learn impulse control[], coping strategies, problem solving and communication of needs in a safe way[.]"  Hearing Decision at 12, ¶ 29; Record, Vol. I at 255.  No outside placement was specified; however, PET minutes state that the team was to continue to follow up with Spurwink and  with the  Margaret Murphy School in Auburn, another potential outside placement discussed at the meeting.  *Id.*; *see also* Record, Vol. I at 254.  The PET also crafted a new IEP for KC to run from January 25, 2006 to January 24, 2007 ("2006-07 IEP"), agreeing to add behavioral goals to the IEP when such goals were developed with the benefit of a Woodfords Family Services ("Woodfords") consultation.  Hearing Decision at 12, ¶¶ 28, 30; Record, Vol. I at 232-45, 254; *see also Geren*, Day 3 Transcript at 8.[8]  The family was open to exploring outside placements at the time.  *Mrs. C*, Day 2 Transcript at 10-13.

29.      The 2006-07 IEP called for KC to receive occupational therapy, speech therapy and direct special-education instruction.  Hearing Decision at 12, ¶ 30; Record, Vol. I at 232.  New goals

---

[8] The suggestion that the District seek an outside behavioral consultation from Woodfords was made by Jennifer Stanford, KC's Community Counseling Services case manager.  Hearing Decision at 12, ¶ 28; Record, Vol. I at 254; Testimony of Jennifer Stanford ("*Stanford*"), Day 6 Transcript at 117-18, 120.  Jennifer Donlon, co-director of special services for MSAD No. 6, readily agreed to contract with Woodfords to perform a behavioral consultation for KC.  *Donlon*, Day 5 Transcript at 3-4, Day 6 Transcript at 72.  Mrs. C was very happy with that response, *Mrs. C*, Day 2 Transcript at 14, and minutes of the January 24, 2006 PET note that all (*continued on next page*)

for educational performance were drafted in the areas of computer technology, functional life skills, reading, language comprehension and speech.  Hearing Decision at 12-13, ¶ 30; Record, Vol. I at 236-41.  Although the IEP did not specify mainstream classes, it appeared that KC was to continue in mainstream art and physical education.  Hearing Decision at 13, ¶ 30; Record, Vol. I at 232, 253.  Turner reported that KC had been well-behaved in his ninth-grade mainstream health class but did not benefit much from its content and occasionally left the classroom because he "shut down."  Hearing Decision at 13, ¶ 30; *Turner*, Day 4 Transcript at 91.[9]  In addition, the behavior plan Turner had created was incorporated.  Hearing Decision at 13, ¶ 30; Record, Vol. I at 245.

30.     On January 24, the same day as the PET meeting, Turner returned to Mrs. C all of KC's food and cooking supplies that he frequently had used to prepare his own lunch in Room 120.  *Turner*, Day 3 Transcript at 116, Day 4 Transcript at 140-41; *Mrs. C*, Day 6 Transcript at 129-30.  KC did not cook his own lunch in Room 120 for the remainder of the school year.  *Mrs. C*, Day 2 Transcript at 41, 60; *Turner*, Day 3 Transcript at 116, Day 4 Transcript at 191.[10]

31.     On January 26, Turner visited Margaret Murphy School as a possible private placement for KC.  Hearing Decision at 13, ¶ 31; *Turner*, Day 4 Transcript at 30.  Mrs. C did not join Turner because she believed that Donlon had removed that school from consideration, primarily because of its distance.  Hearing Decision at 13, ¶ 31; *Mrs. C*, Day 2 Transcript at 13-14.  After her visit, Turner phoned Mrs. C to let her know she did not think it an appropriate placement for KC.  Hearing Decision at 13, ¶ 31; *Turner*, Day 4 Transcript at 147.

---

were in favor of the Woodfords consultation, Record, Vol. I at 254.

[9] The Hearing Officer stated that Turner testified KC "often" had to leave the room because he shut down, Hearing Decision at 13, ¶ 30; however, Turner testified KC occasionally had to do so, *Turner*, Day 4 Transcript at 91.

[10] Turner testified that because the kitchen was well-stocked with food, she simply was returning superfluous food to Mrs. C that KC was not using, and that KC regularly was offered the opportunity to cook when his peers were not present in Room 120 but declined to do so, apart from making popcorn a few times.  *Turner*, Day 4 Transcript at 141-42.  Nonetheless, the Hearing Officer correctly observed that Turner acknowledged the family was never informed that KC was allowed back in the classroom to cook, thus eliminating any possibility they would replenish his supplies.  Hearing Decision at 48; *Turner*, Day 4 Transcript at 142.  Mrs. C testified (*continued on next page*)

32.     Turner had a phone conversation with Mrs. during a weekend at the end of January in which, in response to Mrs. C's query why KC could not return to his classroom, Turner "took at tone" with Mrs. C in describing the January 9 incident, telling her that KC would not be allowed back in her room for the next eight or nine months "unless he had a bodyguard."  Hearing Decision at 13, ¶ 32; *Mrs. C*, Day 2 Transcript at 18-19; *Turner*, Day 4 Transcript at 149-50.  Turner later regretted this comment, which she intended to be sarcastic.  Hearing Decision at 13, ¶ 32; *Turner*, Day 4 Transcript at 149-50.

33.     At the school's request, Mrs. C kept KC out of school on January 30 and 31 while school staff readied a space for him in the so-called "red portable" classroom.  *Mrs. C*, Day 2 Transcript at 17-18.  Once the red portable was ready – outfitted only with a desk, curtain, cot and KC's work – KC returned to school on February 1.  *Id.* at 18-19.  Again, he received only one-on-one instruction while in the red portable, with a second adult present at all times as a safety measure.  *Id.* at 19-20; *Donlon*, Day 6 Transcript at 76-77.

34.     Another PET meeting was held on February 1.  Hearing Decision at 13, ¶ 33; Record, Vol. I at 225.  The team discussed KC's placement in the red portable classroom and noted that the Woodfords behavioral consultant was to begin working on KC's plan immediately.  Hearing Decision at 13, ¶ 33; Record, Vol. I at 226-27.  Both educational technicians involved in instructing KC noted the toll that events were taking on KC, stating that he had needed "lots of support to stay focused and in control[]" and that he had "not settled back to his 'old self' yet[.]"  Record, Vol. I at 227.  As of the time of the February 1 meeting, Mrs. C was supportive of hiring the Woodfords consultant, with a view toward enabling KC to return to his BEHS classroom and avoiding an outside placement.  *Donlon*, Day 5 Transcript at 31.  According to PET minutes, the "general concerns of the entire team

---

that it had been a requirement that she restock the supplies for KC's cooking class.  *Mrs. C*, Day 6 Transcript at 129-30.

[were] around safety & [least restrictive environment]." Record, Vol. I at 227. KC was to begin

reintegration with non-classroom activities (such as on-the-job training, cafeteria, physical education

and recycling) "as tolerated" and interact with peer visitors at lunch and/or class times "as tolerated."

*Id*. at 226. Staff was to have a crisis-intervention review if requested. *Id*.

35.    The family and the District have very different perceptions of KC's activities during

the time he was in the red portable. Hearing Decision at 13, ¶ 34. Turner testified that KC had two

educational technicians with him at all times and that she went out to the red portable every block to

check on his progress. Hearing Decision at 13-14, ¶ 34; *Turner*, Day 4 Transcript at 39. She stated

that KC was offered the chance to participate in gym class but often chose to walk the track instead of

attend class, that he performed his on-the-job training of delivering announcements and that he was

given the choice of several locations inside the school building for lunch. Hearing Decision at 14, ¶

34; *Turner*, Day 4 Transcript at 38. Turner also testified that KC was offered the chance to participate

in life-skills activities in Room 120, such as using the washer, dryer and dishwasher, when less able

students were not in the room, but that he consistently refused, saying the machines were too loud.

Hearing Decision at 14, ¶ 34; *Turner*, Day 4 Transcript at 40-41.

36.    Mrs. C believed that KC was not allowed to leave the red portable to go into the main

school building and that there were no peers in the red portable with him all day. Hearing Decision at

14, ¶ 35; *Mrs. C*, Day 2 Transcript at 20; Record, Vol. III at 888, 890. She testified that Turner called

her at home during this period to encourage her to continue pursuing an outside placement, suggesting

that she should be upset about KC's restrictive placement in the red portable. Hearing Decision at 14,

¶ 35; *Mrs. C*, Day 2 Transcript at 21. Mrs. C was very upset and phoned Donlon to complain about

the call; Donlon instructed Turner to cease phoning Mrs. C to push her to pursue a day-treatment

alternative. *Id*.; *Donlon*, Day 6 Transcript at 74-76. KC displayed anxious behaviors while in the red

portable and expressed a desire not to go to school.  Hearing Decision at 14, ¶ 35; *Mrs. C*, Day 2 Transcript at 23-24, 26-27.[11]

   37.  Woodfords assigned Mark Geren, M.S., Board Certified Behavior Analyst, as KC's behavioral analyst.  Hearing Decision at 14, ¶ 36; Record, Vol. I at 155; *Geren*, Day 3 Transcript at 10-11.  Geren has been a behavioral consultant for eighteen years, working extensively with teens and children with autism for the last seven years.  Hearing Decision at 14, ¶ 36; *Geren*, Day 3 Transcript at 4.  He has created functional behavioral assessments and behavioral intervention plans through observation and data collection for schools, hospitals, treatment centers and other organizations. Hearing Decision at 14, ¶ 36; *Geren*, Day 3 Transcript at 5-9, Day 5 Transcript at 123-24.  On February 2, Mrs. C sent Geren an e-mail message providing him with her contact information and urging him to contact her.  Record, Vol. III at 893.  On February 8, Mrs. C sent Geren another e-mail message expressing concern about KC's segregated educational experience, but Geren refused to communicate with her by e-mail and generally was too busy to talk on the phone.  *Id*.; *Mrs. C*, Day 2 Transcript at 33-34; *Geren*, Day 5 Transcript at 132.  Geren eventually spoke with Mrs. C by phone to obtain KC's history.  *Mrs. C*, Day 2 Transcript at 34.  Prior to submitting his March 1 report, he also conducted a file review with Turner, met with various school officials and observed KC twice at school (once in the red portable, once at lunch in Room 120).  Record, Vol. I at 211-14; *Geren*, Day 5 Transcript at 107.

   38.  Soon after Geren began to work on KC's case in early February 2006 he realized that there were "multiple agendas at work."  Hearing Decision at 15, ¶ 37; Record, Vol. I at 211.  He

---

[11] The Hearing Officer supportably found that while KC was in the red portable, he was not allowed into Room 120 unless his peers were absent, although he went into the school building for speech therapy in Room 121 several times a week.  Hearing Decision at 43; *see also Turner*, Day 4 Transcript at 38, 156; *Mrs. C*, Day 2 Transcript at 53.  She also found that KC's daily logs revealed that about halfway through his twelve days in the red portable, he began to deliver announcements in the main school building, attend gym or take a walk, and have lunch in Room 120 when his peers were absent.  Hearing Decision at 43; *see also* Record, Vol. II at 510- (*continued on next page*)

perceived that Mrs. C wanted KC back in Room 120 immediately but that special-education staff wished to reintroduce him gradually.  *Id*.  He sought a meeting with school administrators, special-education staff and Mrs. C in an attempt "to have all parties in agreement on the goals of a presumed intervention[.]"  *Id*.  The meeting was held on February 14, but Mrs. C did not attend because no one from the school invited her.  Hearing Decision at 15, ¶ 37; *Mrs. C*, Day 2 Transcript at 32; *Donlon*, Day 6 Transcript at 78.

        39.     At the February 14 meeting, school officials and special-education staff disagreed whether KC should continue to be educated at BEHS at all.  Hearing Decision at 15, ¶ 38; *Donlon*, Day 6 Transcript at 78-81.  While school administrators were not comfortable with KC being placed anywhere at BEHS, special-education staff wanted to consider returning KC to Room 120 and getting him out of the red portable.  Hearing Decision at 15, ¶ 38; *Donlon*, Day 6 Transcript at 79-81. Despite the disagreement, Geren was instructed to move forward with a plan that would permit KC to remain at BEHS.  Hearing Decision at 15, ¶ 38; *Donlon*, Day 6 Transcript at 79-80.[12]

        40.     On February 16, Mrs. C wrote Donlon that she felt the red portable was not the least restrictive environment in which KC could be educated and requested that he be returned to Room 120.  Hearing Decision at 15, ¶ 39; Record, Vol. III at 888, 890.  She expressed the view that Geren would be hindered in creating a successful behavior plan unless he could observe KC in his normal classroom setting.  Record, Vol. III at 890.  She suggested that Turner had escalated the January 9 incident to scare school staff into thinking KC was dangerous in order to keep him out of her classroom.  Hearing Decision at 15, ¶ 39; Record, Vol. III at 890.  She requested that Turner be placed

---

22.

[12] In resisting KC's continued placement at BEHS, the BEHS school administrator invoked the school board's "zero tolerance" policy toward violence, aggression and disruption.  *Donlon*, Day 6 Transcript at 80; *see also Donlon*, Day 5 Transcript at 22.  If another incident had occurred at BEHS in which KC struck a staff member, his continued placement there would have been jeopardized.  *Donlon*, Day 6 Transcript at 100-01, Transcript, Day 7 of Due Process Hearing, *[C] vs SAD #6*, Case No. 06.024AH, Record, (*continued on next page*)

on administrative leave, asserting that she would "guarantee [KC] to be successful and to return to his normal self" if he were returned to Room 120 with a different teacher. Hearing Decision at 15-16, ¶ 39; Record, Vol. III at 890. Mrs. C also phoned Donlon the same day to convey those concerns and requests; Donlon advised her to seek legal advice. *Mrs. C*, Day 2 Transcript at 41-43.

41.     Mrs. C kept KC out of school from Friday, February 17 until Wednesday, March 8 (a week of which was February vacation). Hearing Decision at 16, ¶ 40; *Mrs. C*, Day 2 Transcript at 41-44. On February 21, the family filed a request for a complaint investigation and a mediation with the Due Process Office of the MDOE. Hearing Decision at 16, ¶ 40; Record, Vol. IV at 904. During the time KC was kept home from school, he was confused, but his anxious behaviors decreased. Hearing Decision at 16, ¶ 40; *Mrs. C*, Day 2 Transcript at 44.

42.     On March 1 Geren provided a brief report, noting that he was not comfortable recommending a specific plan until the parties had agreed on whether KC would be reintroduced to Room 120, either immediately or gradually, or placed out-of-district. Hearing Decision at 16, ¶ 41; Record, Vol. I at 211. Geren felt that returning KC to the classroom right away was too risky and recommended a graduated approach to his reentry over several weeks or months. *Id.*; *Geren*, Day 3 Transcript at 24. He agreed that KC should not be kept in the red portable for an extended period of time. Hearing Decision at 16, ¶ 41; Record, Vol. I at 211. He observed that "it may not be in [KC's] best interest for treatment providers and educators to merely 'move the world environment out of his way.'" Record, Vol. I at 213. He predicted that, although KC was a productive student, he would draw most of the day if left to his own devices. *Id.* He recommended that, once a placement was agreed upon, there be a functional assessment to ascertain the likely function of KC's behaviors. Hearing Decision at 16, ¶ 41; Record, Vol. I at 214. He also recommended that a behavior plan be

---

Vol. VI at 1686-1750 ("Day 7 Transcript"), at 195, 197. In that instance, Donlon would have sought an outside placement for him. (*continued on next page*)

developed, ongoing analysis be undertaken, the staff be trained on the behavioral plan and on safety measures, and there be frequent clinical oversight and adjustments to the plan.  *Id*.  He noted that, while the function of KC's outbursts was not yet clear, it would be reasonable to hypothesize that they were attempts to escape or avoid demands.  Hearing Decision at 16, ¶ 42; Record, Vol. I at 213.

  43. Another PET meeting was held on March 6 to review the initial Geren report and KC's programming.  Hearing Decision at 17, ¶ 43; Record, Vol. I at 206-09.  Mrs. C did not attend because she understood that the PET meeting had been canceled and that a mediation would be held instead on the same date, as outlined in a letter from the District's attorney.  Hearing Decision at 17, ¶ 43; Record, Vol. IV at 904-05; *Mrs. C*, Day 2 Transcript at 44-45.[13]  Concerns were expressed about KC's continuation in art class given the presence of dangerous items in the classroom.  Hearing Decision at 17, ¶ 44; Record, Vol. I at 207-08.  KC, who previously had participated in the mainstream art class without behavioral incident, *Mrs. C*, Day 2 Transcript at 68, was removed from art from that point on, Hearing Decision at 17, ¶ 44; *Turner*, Day 4 Transcript at 113-14.

  44. A mediation was held the afternoon of March 6.  Hearing Decision at 17, ¶ 45; Record, Vol. III at 877.  The parties agreed that KC would "return to special ed program [at] Bonn[y] Eagle [with] Carla Turner as teacher on Wednesday, March 8" and that the District would "work on relocating quiet space" for him "in a room directly outside of [the] class room."  Hearing Decision at 17-18, ¶ 45; Record, Vol. III at 877.  The parties specifically agreed that the red portable would not be used for quiet time.  Hearing Decision at 18, ¶ 45; Record, Vol. III at 877.  The District asked Mrs.

---

*Donlon*, Day 7 Transcript at 197.

[13] While Turner testified that she phoned Mrs. C from the meeting and was informed that Mrs. C would not attend, the Hearing Officer supportably found that no such call was placed and that Mrs. C was unaware the meeting was taking place.  Hearing Decision at 17, ¶ 43 & 35-36; Record, Vol. I at 206 (no documentation that effort made to contact parents); *Mrs. C*, Day 6 Transcript at 135-36; Testimony of Mr. C ("*Mr. C*"), Day 6 Transcript at 125-26.

C to keep KC home on March 7 to allow the staff to prepare for KC's return.  *Hearing Decision* at 18, ¶ 45; *Mrs. C*, Day 2 Transcript at 49.

45.      When KC returned to school on March 8, he was placed in Room 120A – a small, windowless room right outside Room 120 that had previously been used as an office.  *Hearing Decision* at 18, ¶ 46; *Mrs. C*, Day 2 Transcript at 51-52; *Turner*, Day 3 Transcript at 97.  The office furniture had been removed and replaced with a beanbag, pillow and blanket.  *Hearing Decision* at 18, ¶ 46; *Mrs. C*, Day 2 Transcript at 75.  The door to Room 120 was locked so that KC could not go into the classroom.  *Hearing Decision* at 18, ¶ 46; *Mrs. C*, Day 2 Transcript at 55.

46.      A PET meeting was held again on March 10.  *Hearing Decision* at 18, ¶ 47; Record, Vol. I at 199-204.  Geren was present to discuss his initial report and his proposal for data collection over the next few weeks.  *Id*.  Upon arriving for the meeting, Mrs. C learned for the first time of KC's placement in Room 120A, which she had not understood would be the fruit of the mediation agreement and which she perceived as leaving her son just as isolated as he had been in the red portable – the only difference being that he could now hear the voices of his peers on the other side of the wall beyond the locked door that prevented him from entering the classroom.  *Mrs. C*, Day 2 Transcript at 51-52, 56-58.  At the meeting that day, Mrs. C voiced her objection to the placement.  *Hearing Decision* at 18, ¶ 47; *Mrs. C*, Day 2 Transcript at 57.  Nancy Parent, KC's occupational therapist, also expressed concern that KC was spending too much time in Room 120A.  *Hearing Decision* at 18, ¶ 47; *Mrs. C*, Day 2 Transcript at 56.  The Prior Written Notice of a Program Change given to the family at the conclusion of the PET meeting indicated that full reintegration of KC on an immediate basis had been rejected due to the fact that the behavioral plan was not yet in place.  *Hearing Decision* at 37; Record, Vol. I at 199.

47.     That day, Geren provided antecedent behavior and consequences ("ABC") forms to be used to record KC's behaviors, their immediate antecedents or precursors and immediate consequences as a first step toward development of a behavioral-intervention plan.  Hearing Decision at 18, ¶ 48; Record, Vol. I at 203; *Geren*, Day 3 Transcript at 25, 30-31.  Geren also provided partial interval data forms to record instances of physical aggression, environmental disruption, anxious behavior and ability to remain on task.  Hearing Decision at 18-19, ¶ 48; *Geren*, Day 3 Transcript at 32.  Data collection commenced on March 13.  *Geren*, Day 3 Transcript at 31-32.

48.     On March 14, Mrs. C requested that KC not remain in Room 120A.  Hearing Decision at 19, ¶ 49; Record, Vol. III at 889.  She believed that resistance on Turner's part was the only reason KC had not been returned to Room 120.  Hearing Decision at 19, ¶ 49; Record, Vol. III at 870.  She interpreted the assessments of Scammon and Dr. Pershouse, in conjunction with the determination that KC's aggressive behavior was a manifestation of his disability, to mean that he was not a safety concern to himself, his classmates or school staff.  Hearing Decision at 19, ¶ 49; Record, Vol. III at 867.

49.     On March 21 Mrs. C again removed KC from school.  Hearing Decision at 19, ¶ 51; *Mrs. C*, Day 2 Transcript at 64-65.  On March 27, she e-mailed Donlon that she would return KC to school only if he could be returned to Room 120.  Hearing Decision at 19, ¶ 52; Record, Vol. III at 866.  Mrs. C also e-mailed other school officials, stating that she believed her son had not assaulted a teacher and noting that Turner did not need medical attention after the incident.  Hearing Decision at 19, ¶ 52; Record, Vol. III at 867.  She refused to return KC to "an isolated closet type room with constant one on one tu[t]oring . . . with the door locked to his classroom[,]" which she found to be inconsistent with the mediation agreement, KC's IEP and his PET recommendations.  Hearing Decision at 19-20, ¶ 52; Record, Vol. III at 867.  She stated that the arrangement was "not fit for an

animal much less my son." Hearing Decision at 20, ¶ 52; Record, Vol. III at 867. She argued that portraying KC as unsafe to his peers was unfair to him. *Id*.

50.     During the period from March 8 through March 21, KC completed written math and English assignments and continued to receive occupational and speech therapy. Hearing Decision at 48; *Mrs. C*, Day 2 Transcript at 60; *Turner*, Day 3 Transcript at 113. He did not, however, work on many of his life skills related to cooking and shopping during that time. Hearing Decision at 48; Record, Vol. I at 238; *Mrs. C*, Day 2 Transcript at 60; *Turner*, Day 3 Transcript at 115-16. Nor did he choose to use appliances such as the washer, dryer, blender, microwave, food processor and telephone. Record, Vol. I at 238; *Turner*, Day 3 Transcript at 115-16. From February 21 through April 10, KC continued to be excluded from mainstream art and activities in Room 120 that involved other students. Hearing Decision at 48-49; *Turner*, Day 4 Transcript at 113-14. During the third quarter of the 2005-06 school year, he also missed three field trips and a swimming program. Hearing Decision at 49; *Turner*, Day 4 Transcript at 119-20, 176-77.[14]

51.     On March 28, Mrs. C filed the family's initial request for a due-process hearing, Hearing Decision at 20, ¶ 53; Record, Vol. I at 1-2. In so doing, the family invoked KC's "stay put" rights. Record, Vol. I at 1-2.

52.     In March and early April, Dr. David Lennox provided safety training to ten to twelve staff members to provide them with strategies for preventing, minimizing and managing behavioral issues of students with communication deficits ranging from noncompliance to physical assaults. Hearing Decision at 20, ¶ 54; Record, Vol. I at 194; *Lennox*, Day 3 Transcript at 147-50; *Turner*, Day 4 Transcript at 66.

---

[14] The third quarter encompassed the period from January 23 through April 7, 2006. *Turner*, Day 4 Transcript at 220.

53.     On April 3, another PET meeting was held at which both Mrs. C and Geren again were present.  Hearing Decision at 20, ¶ 55; Record, Vol. I at 186-94.  The PET determined that (i) data collection would continue once KC was returned to school, (ii) Geren would provide the team with a plan based on the ABC data that had been collected, even though it was not the full two weeks' worth of data he had sought, (iii) the plan would include KC beginning his day in Room 120 with opt-out opportunities every five minutes, and (iv) behavioral goals for KC would reflect an attempt to extinguish disruptive behavior.  Hearing Decision at 20, ¶ 55; Record, Vol. I at 186; *Geren*, Day 3 Transcript at 38.  Geren stated that KC's absence and the resultant lack of data had delayed the process.  Hearing Decision at 20, ¶ 55; Record, Vol. I at 189.  He suggested that KC be allowed forty-five minute opportunities in Room 120 after two weeks of non-aggression in Room 120A.  Hearing Decision at 20, ¶ 55; Record, Vol. I at 190.  The decision to remove KC from mainstream art was reviewed, with the art teacher expressing discomfort with KC's return until the PET could assure that his behavior would be safe.  Hearing Decision at 37-38; Record, Vol. I at 192. At the meeting, Turner continued to describe KC as a safety risk.  *Mrs. C*, Day 2 Transcript at 66-69. Mrs. C became so upset by Turner's tone of voice and portrayal of KC as a safety risk that she left the meeting early in tears.  Hearing Decision at 20, ¶ 55; *Mrs. C*, Day 2 Transcript at 69.

54.     On April 5, Geren submitted an eight-page "Initial Behavior Treatment Plan" after observing KC at school twice, speaking with Mrs. C to obtain his history and interviewing Turner.  Hearing Decision at 20, ¶ 56; Record, Vol. I at 178-85.  Geren developed the plan on the assumption that KC's outbursts were the result of an inability to request a break when needed or the denial of access to a preferred activity or item.  Hearing Decision at 20-21, ¶ 56; Record, Vol. I at 178.  The purposes of the plan were (i) to define KC's preferred conditions or activities that would predict the absence of problem behaviors and (ii) to get him back into his classroom as much as possible.

Hearing Decision at 21, ¶ 56; Record, Vol. I at 179.  Under the plan, KC would be offered continuous access to the widest possible array of preferred items, activities, conditions and social interactions. Hearing Decision at 21, ¶ 56; Record, Vol. I at 178.  He would be observed constantly and cued every five minutes to make a choice from a pictorial array containing choices that could include English, math, life skills, sitting on a beanbag, playing cards, drawing, listening to music, snacking, folding towels, sitting, chatting, reading, listening to a story and walking.  Hearing Decision at 21, ¶ 56; Record, Vol. I at 180-81; *Turner*, Day 4 Transcript at 186-87.  He was not to be prompted to pick any particular activity.  Hearing Decision at 21, ¶ 56; *Turner*, Day 4 Transcript at 187, 190.  In the plan, Geren stated: "NOTE. THERE IS NO CONSEQUENCE FOR NOT BEING ON TASK.  THIS IS JUST A MEASURE OF A DESIRABLE BEHAVIOR[.]"  Record, Vol. I at  180.  The plan sought to reduce aggression and environmental disruption to zero and then slowly increase academic demands and eventually return KC to his full curriculum.  Hearing Decision at 21, ¶ 56; Record, Vol. I at 179.[15]  In Geren's experience, this approach was more likely to be successful than a plan that created consequences for negative behavior.  Hearing Decision at 21, ¶ 56; *Geren*, Day 5 Transcript at 99-100.[16]

55.    Dr. Lennox described the "continuous choice" concept driving Geren's plan as a very common behavioral approach to autistic children with communication difficulties – a "standard protocol . . . to try and teach an . . . educationally appropriate alternative to escape so that the other more aberrant methods of escaping are not reverted to."  Record, Vol. I at 180-81; *Lennox*, Day 3 Transcript at 166, 177.

---

[15] The plan defined "aggression" as "[s]triking others with hands, feet or objects; throwing objects at others; spitting on others; any attempt that is blocked or misses."  Record, Vol. I at 180.  It defined "environmental disruption" as "[t]apping or banging on the tables, walls, windows, computers, fixtures, doors; clearing tables attempting to throw computer onto the floor; attempts that are blocked from occurring; vocal shriek; yelling/screaming."  *Id.*

[16] The Parents assert that Geren admitted his plan was not based on a functional behavior assessment – a proposition for which they (*continued on next page*)

56.     In his April 5 treatment plan Geren explained, *inter alia,* that "the objective is not to maximize work output at this time, but rather to begin to make [KC] more available for learning.  The first objective is to have him reliably calm and relatively anxiety-free in the school setting."  Record, Vol. I at 182.  Staff were to "[p]raise [KC] for looking very relaxed and for doing his activity."  *Id*. Staff were directed: "If he wants to talk, talk with him for as long as he continues to try to engage with you."  *Id*.  KC's choice board could "contain some of his previous academic tasks.  If he asks to do one of these, grant the request.  Task completion will not be the criteria for engaging with him.  Staff will continue to offer choice every 5 minutes."  *Id*.  Geren advised that it might "take several weeks or months" to accomplish the plan's goals; as of the time of the hearing held in the instant case, he envisioned the plan continuing into the 2006-07 school year.  *Id*. at 211-12; *Geren,* Day 5 Transcript at 170.

57.     Mrs. C was concerned that the behavior intervention plan failed to incorporate educational goals, created an unreasonable goal of reducing KC's environmental disruptions to zero and provided him with so many choices that it would aggravate him.  Hearing Decision at 21, ¶ 57; *Mrs. C*, Day 2 Transcript at 71-73.  Geren testified that the level of IEP work introduced at the start of such a behavioral plan was highly individualized and would be increased over time.  Hearing Decision at 21, ¶ 57; *Geren*, Day 5 Transcript at 176-78.

58.     On April 10 Mrs. C returned KC to school under protest, and implementation of the behavioral plan began.  Hearing Decision at 22, ¶ 58; Mrs. C, Day 2 Transcript at 70-71.  All told, the family had kept KC out of school for nineteen school days (from February 17 through March 7 and March 22 through April 7, 2006).  Record, Vol. I at 150-51.[17]  At Mrs. C's request, KC was not

---

provide no Record citation – and that the lack of such an assessment violated Maine state regulations.  *See* Parents' Brief at 21 n.4.  The Record evidence is to the contrary.  *See, e.g.*, Record, Vol. I at 178.

[17] KC also was marked as absent on January 30-31 and February 6, 2006; however, Mrs. C testified that she kept him home on (*continued on next page*)

allowed to use Room 120A or the quiet room for academic work. Hearing Decision at 22, ¶ 58; *Turner*, Day 4 Transcript at 76, 227, 229-30. The behavioral plan proceeded until the end of the year, with cuing eventually extended from every five to every fifteen minutes. Hearing Decision at 22, ¶ 58; *Turner*, Day 4 Transcript at 73-74. In late April, Turner asked staff to begin recording the location that KC chose for each fifteen-minute block on the Partial Interval Data sheets. Hearing Decision at 22, ¶ 58; *Geren*, Day 3 Transcript at 41; *Turner*, Day 4 Transcript at 187-88.

59. The behavioral intervention plan was incorporated into KC's IEP with the addition of a behavior goal on April 10. Hearing Decision at 22, ¶ 59; Record, Vol. I at 177. That goal – that, given a behavioral intervention plan, KC would "communicate his needs for change without disruption, in a socially appropriate way 100% of the time as measured by data sheets and daily logs" – was drafted by Turner and not reviewed by KC's PET. *Id*.; *Turner*, Day 4 Transcript at 138. Although the behavioral intervention plan itself recited an objective of reducing to zero KC's environmental disruptions and aggression, it also included the more moderate and concrete goals of keeping KC free from disruption in the classroom for two consecutive weeks, decreasing his anxious behavior by fifty percent and allowing him to resume work within Room 120 for eight-five percent of the time for one consecutive week by the end of the school year. Hearing Decision at 38-39; Record, Vol. I at 179.

60. Geren revised his behavior intervention plan on May 26 to reflect minor changes. Hearing Decision at 23, ¶ 61; Record, Vol. II at 372; *Geren*, Day 5 Transcript at 75-76. He removed from the definition of "environmental disruption" loud vocalizations, which staff were asked to record as a separate, standalone category, and removed from the definition of "anxious behavior" hair stereotypy, which staff also were asked to record as a separate, standalone category. Record, Vol. I at

---

those three days at the school's request. Record, Vol. I at 150-51; *Mrs. C*, Day 2 Transcript at 18-19, 49.

372; *Geren*, Day 5 Transcript at 81-85.  While KC's loud vocalizations and hair stereotypy were mildly disruptive, neither type of behavior was a clear antecedent to aggression on his part.  *Geren*, Day 5 Transcript at 85.  At the time of the plan's modification, loud vocalizations comprised the entirety of environmental disruptions, and hair stereotypy comprised the bulk of anxious behaviors, in which KC was noted to have engaged after April 10, 2006.  *Geren*, Day 5 Transcript at 82, 84-85. The behavioral-intervention plan, as amended, was applied until the end of the school year in June. *Turner*, Day 4 Transcript at 189.[18]

61.    From April 10 onward, KC's choice array contained most of the programming in his IEP except for cooking and mainstream art.  Hearing Decision at 50; *Turner*, Day 4 Transcript at 186-87, 204.  He was included on field trips and the Special Olympics.  Hearing Decision at 50; *Turner*, Day 4 Transcript at 119, 206-07.  He also delivered daily announcements.  Hearing Decision at 50; *Mrs. C*, Day 2 Transcript at 74.  KC's daily log sheets for this period reveal few instances in which he took part in cooking or used the appliances or the computer, although he did undertake a functional math activity in time, money or measuring nearly every day.  Hearing Decision at 54; Record, Vol. II at 394-459, Vol. III at 740-83.

62.    During the first quarter of his tenth-grade year, KC produced forty-one math assignments and fifty-four English assignments.  Hearing Decision at 23, ¶ 62; *Turner*, Day 3 Transcript at 112.  During the second quarter, he completed fifty math assignments and fifty English

---

[18] Geren testified that his behavior plan was not fully implemented as designed until after May 16, 2006.  *Geren*, Day 5 Transcript at 151.  Prior to that date, the staff was shaping KC's choice array by narrowing it based on the activities staff believed KC would pick from the larger choice array.  *Id.* at 146-47.  In addition, prior to March 20, staff recorded KC as being "on task" when he chose a non-IEP activity such as relaxing, although they were supposed to record only IEP-related activities as "on task."  *Id.* at 88-89, 151. The Hearing Officer supportably determined that these errors were not significant enough to render incompetent the bulk of the data collected.  Hearing Decision at 52 n.10.  Geren testified that the staff's narrowing of choices prior to May 16 affected data-gathering "only by degree[,]" explaining that "[t]he staff were presumably reasonably capable of offering preferred activities and, of course, the escape condition to 120-A.  It was my understanding that item was always on there."  *Geren*, Day 5 Transcript at 148.  In addition, staff were directed to correct the misunderstanding regarding on-task behavior early in the process, during the preliminary data- (*continued on next page*)

assignments.  Hearing Decision at 23, ¶ 62; *Turner*, Day 3 Transcript at 112-13. During the third quarter (approximately January 23 to April 7), including the time he spent in central office, in the red portable classroom and in Room 120A, KC completed thirty-six math assignments and forty-five English assignments despite his absences.  Hearing Decision at 23, ¶ 61; *Turner*, Day 3 Transcript at 113-14.[19]  During the fourth quarter, he produced seventeen math assignments and sixteen written English assignments and many oral English assignments, often selecting Room 121 as a place to do academic work, although it is not as private as the quiet room or Room 120A.  Hearing Decision at 23, ¶ 61; *Turner*, Day 4 Transcript at 76-77, 221-22.

63.    Sometime in April, KC's IEP was scored to reflect progress toward particular goals. Hearing Decision at 22, ¶ 60; Record, Vol. I at 236-41.  Patricia Milligan, KC's speech therapist, gave him four grades of 1, indicating poor progress, three grades of 2, indicating average progress, and one grade of 3, indicating above-average progress.  Hearing Decision at 22, ¶ 60; Record, Vol. I at 240-41; *Turner*, Day 3 Transcript at 80.  Turner scored KC with complete zeros, indicating no progress, in all other objectives.  Hearing Decision at 22, ¶ 60; Record, Vol. I at 236-39.  Turner testified that because KC was absent twenty-three days during the quarter, including a period of assessment, she scored him as making no progress, but that in retrospect she felt those scores were wrong because he had made progress when present.  Hearing Decision at 22, ¶ 60; *Turner*, Day 3 Transcript at 114-17, Day 4 Transcript at 223-24.  A rescored IEP was offered at hearing but was not accepted into the Record because it had not previously been disclosed to the family.  Hearing Decision at 22, ¶ 60.[20]

---

gathering stage.

[19] The Hearing Officer found that the third quarter ended on March 31 and the fourth quarter began on April 3.  Hearing Decision at 23, ¶ 61; however, Turner testified that the principal extended the third quarter a week, so that it ran from January 23 through April 7, *Turner*, Day 4 Transcript at 220.

[20] The Hearing Officer supportably credited Turner's testimony that the zeros were not representative of KC's progress during the (*continued on next page*)

64.     KC received several grades of 2, indicating average progress, on his fourth-quarter progress report.  Hearing Decision at 54; *Turner*, Day 4 Transcript at 224.  This was consistent with KC's quarterly scores for the 2005-06 school year, which were mostly scores of 2 with a few scores of 3 and 1.  Hearing Decision at 54 n.12; Record, Vol. II at 334-39.[21]

65.     Geren's analysis of data sheets recording the amount of time KC was spending in various settings led him to conclude that KC was in Room 120A for generally decreasing amounts of time from April 10 to the end of the school year.  Hearing Decision at 23, ¶ 63; *Geren*, Day 5 Testimony at 92-93.  Data-sheet analysis also revealed that KC's ability to remain on task doing IEP-related activities increased slightly during the course of the data collection.  Hearing Decision at 23, ¶ 63; *Geren*, Day 5 Transcript at 90-91.  While conceding that KC's level of performance on IEP goals (besides the behavioral goal) dropped pursuant to the continuous-choice plan, Geren deemed KC's performance "actually kind of amazing" inasmuch as KC continued to choose to engage in a substantial amount of academic work although he could have opted out of it.  *Geren*, Day 5 Transcript at 177-78, 181-82, Day 7 Transcript at 154.

66.     Geren testified that he considered the plan to be successful inasmuch as KC exhibited only one minor disruption (throwing his glasses) at school since its implementation.  Hearing Decision at 23, ¶ 64; *Geren*, Day 5 Transcript at 74, 101-02, 186.  He testified that he believed KC had learned to use a quiet space to calm himself down, as evidenced by his observation of KC on the day of a field

---

third quarter, deeming it unlikely, given KC's record of written assignments during that period, that he did not make any progress at all on any of those goals.  Hearing Decision at 48 n.9; *Turner*, Day 4 Transcript at 221-24.

[21] The Hearing Officer noted that the family had expressed concern that KC no longer was eligible to enter the PATHS off-site vocational cooking program in fall 2006 because he did not undertake much cooking over the last half of the school year.  Hearing Decision at 54 n.11.  She found that although KC's PET did not submit an application for him to take part in PATHS that fall, District witnesses testified persuasively that cooking in the classroom was not a prerequisite to the PATHS program and that if KC's PET believed he were behaviorally prepared to undertake the program, the District would do its best to ensure he was able to enroll.  *Id.* This finding was supported by the testimony of both Donlon and Turner and contradicted only by Mrs. C's belief that cooking was a PATHS prerequisite.  *Mrs. C*, Day 2 Transcript at 83; *Turner*, Day 4 Transcript at 191; *Donlon*, Day 6 Transcript at 43-45.  Therefore, I decline to disturb it.

trip, when KC chose to relax in Room 120A prior to the start of the trip.  Hearing Decision at 23-24, ¶ 64; *Geren*, Day 5 Transcript at 94-95, 106-07.

67.     Dr. Lennox testified that he found Geren's data collection and behavioral intervention plans to be well-planned to minimize the risk to others while getting KC back into the classroom gradually.  Hearing Decision at 24, ¶ 65; *Lennox*, Day 3 Transcript at 154-55, 160, 164-66.

68.     Turner also testified that she felt the plan had been successful.  Hearing Decision at 24, ¶ 66; *Turner*, Day 4 Transcript at 73-75, 233.  She felt that after six or eight weeks, KC had significantly increased his ability to communicate the need to take a break.  Hearing Decision at 24, ¶ 66; *Turner*, Day 4 Transcript at 73-75.  She testified that KC regularly requested Room 120A to take a break even without prompting and often went into Room 120A for fifteen-minute periods prior to delivering announcements, reporting that he was getting ready to go to work.  *Id*.

69.     Mrs. C testified that, since the start of data collection, KC spent most of his time in Room 120A sitting on the beanbag with a blanket over his head   Hearing Decision at 24, ¶ 67; *Mrs. C*, Day 2 Transcript at 74.  She felt that the lack of a structured routine in his school day had been detrimental to him and that he had performed very little academic work.  Hearing Decision at 24, ¶ 67; *Mrs. C*, Day 2 Transcript at 75-76.  She also believed the behavioral plan had decreased KC's ability to cope with disappointment.  Hearing Decision at 24, ¶ 67; *Mrs. C*, Day 7 Transcript at 119-20.  She preferred an approach that provided consequences for negative behavior.  Hearing Decision at 24, ¶ 67; *Mrs. C*, Day 7 Transcript at 120.

70.     Mrs. C testified that she believed Turner and KC never had a positive relationship and that KC was fearful of Turner.  Hearing Decision at 25, ¶ 68; *Mrs. C*, Day 2 Transcript at 40-41.  She said she felt Turner placed excessively high academic demands on KC and did not listen to his communications.  *Id*.  Mrs. C felt she could no longer collaborate with Turner.  *Id*.  Turner, on the

other hand, testified that she and KC continue to have a good working relationship. Hearing Decision at 25, ¶ 69; *Turner*, Day 4 Transcript at 78-79. She testified that KC routinely picks her flowers, initiates group hugs and is enthusiastic to be in her classroom. *Id.* Turner felt she could continue to work productively with Mrs. C. Hearing Decision at 25, ¶ 69; *Turner*, Day 4 Transcript at 80-81. Mrs. C admitted that KC had not said he did not want to work with Turner. *Mrs. C*, Day 2 Transcript at 177-78.[22]

71.     Charles Lyons, Ph.D., a consultant with three decades of experience as a special-education educator, professor and administrator, observed KC at school on May 1 and May 24 and reviewed KC's behavioral plan at the family's request. Hearing Decision at 25, ¶ 70; Testimony of Dr. Charles Michael Lyons ("*Lyons*"), Day 1 Transcript at 153-54, 158-59. Dr. Lyons opined that KC had not been provided with a FAPE since the January 9 incident. Hearing Decision at 25, ¶ 70; *Lyons*, Day 1 Transcript at 159. During his two observations of KC at school, which lasted for a total of six-and-a-half hours, KC spent most of his time in Room 120A sitting on a beanbag chair and self-selecting the activity of relaxing. Hearing Decision at 25, ¶ 70; *Lyons*, Day 1 Transcript at 158-60. However, Dr. Lyons acknowledged that the data-collection sheets revealed that KC was performing some IEP-related work. Hearing Decision at 25, ¶ 70; *Lyons*, Day 1 Transcript at 202.[23]

72.     Dr. Lyons found the data collection flawed in that KC was not required during that period to undertake IEP activities. Hearing Decision at 25, ¶ 71; *Lyons*, Day 1 Transcript at 167-68. He also criticized the plan as inadequate because it did not provide any consequences for negative

---

[22] The Hearing Officer supportably resolved this conflict in favor of the District, finding no evidence that KC was aware of or impacted by the hostility between Turner and his parents. Hearing Decision at 58; *see also, e.g., Mrs. C*, Day 2 Transcript at 177-78; *Turner*, Day 4 Transcript at 78-79; Testimony of Tracy Welch ("*Welch*"), Day 7 Transcript at 26-27.

[23] The Hearing Officer supportably found that, although Dr. Lyons opined that KC regressed academically under the behavioral plan, his testimony pointed to no objective evidence to suggest that this was the case. Hearing Decision at 53; *Lyons*, Day 1 Transcript at 176-79, 212-14. She also reasonably rejected Dr. Lyons' opinion that KC struck Turner as a result of his perception of the hostility between his mother and Turner, noting that Dr. Lyons later acknowledged that there had been no hostility between the two women prior to the January 9 incident. Hearing Decision at 58; *Lyons*, Day 1 Transcript at 207-10.

behavior or poor choices by KC.  Hearing Decision at 25, ¶ 71; *Lyons*, Day 1 Transcript at 166, 170. He felt KC did not pose any greater threat than any other autistic adolescent and that good educators could recognize signs of distress before aggression occurred.  Hearing Decision at 25-26, ¶ 71; *Lyons*, Day 1 Transcript at 168, 171.  After reviewing the incidents in sixth grade in which KC had acted aggressively toward Price, he concluded that those incidents had something to do with KC's relationship with Price, given that no other serious incidents were reported during KC's middle-school years.  Hearing Decision at 26, ¶ 71; *Lyons*, Day 1 Transcript at 172.  Dr. Lyons testified that he believed KC could obtain a FAPE at BEHS only with a better designed behavioral plan and with Turner removed as his classroom teacher.  Hearing Decision at 26, ¶ 72; *Lyons*, Day 1 Transcript at 173-75.

73.     The family accepted an offer by the District to provide KC with ten weeks of STRIVE summer camp, including tuition, transportation and an adult aide, to compensate for the weeks KC was out of school as a result of the family's frustration.  Hearing Decision at 26, ¶ 73; Record, Vol. III at 902.[24]  The District provided one-on-one support for KC at the STRIVE program through Tracy Welch, an educational technician at BEHS, and Holly Marston, who was hired by the District on a limited basis as an aide for KC's STRIVE and Extended School Year services programs.  Hearing Decision at 26, ¶ 73; *Welch*, Day 7 Transcript at 4-5; *Marston*, Day 7 Transcript at 45-47.

74.     On June 22 Turner brought the Geren behavioral intervention plan to the STRIVE camp and asked Welch and Marston to implement it with some modifications.  Hearing Decision at 26, ¶ 74; *Welch*, Day 7 Transcript at 26-27; *Donlon*, Day 7 Transcript at 185-87, 190.  Welch roughly implemented it that afternoon.  Hearing Decision at 25, ¶ 74; *Welch*, Day 7 Transcript at 30-31. Welch then spoke to Mrs. C about the plan, and both agreed it was not necessary for use at camp given

---

[24] Mrs. C accepted this offer with the caveat that it did not suffice to compensate KC for educational losses suffered during the 2005-
(*continued on next page*)

its leisure activities and low demand level. Hearing Decision at 25, ¶ 74; *Welch*, Day 7 Transcript at 31. Mrs. C did not return the behavioral plan notebook to camp after it came home in KC's backpack the afternoon of June 22, and it was not used for the rest of that week or the following week. Hearing Decision at 26-27, ¶ 74; *Marston*, Day 7 Transcript at 49-50; *Donlon*, Day 7 Transcript at 189. When Donlon encouraged Mrs. C to allow the behavioral intervention plan to be employed at STRIVE, Mrs. C assured her that STRIVE was fun for KC and that he was allowed to opt out if he wanted, so no plan was needed. Hearing Decision at 27, ¶ 74; *Donlon*, Day 7 Transcript at 187-88. She was confident no incidents would occur. *Id.*; *Mrs. C*, Day 6 Transcript at 140-41.

75.    On June 29 KC had a behavioral outburst in which he struck a camp counselor, Rebeckah Perry. Hearing Decision at 27, ¶¶ 75-76; Record, Vol. II at 391. KC had been told earlier in the day by both Marston and Welch that he could go to the mall with Marston the following day if he behaved. Hearing Decision at 27, ¶ 76; *Welch*, Day 7 Transcript at 9, 14. That afternoon, after declining a suggestion by Welch that he join in a craft project, KC threw his glasses twice and yelled some profanities. Hearing Decision at 27-28, ¶ 76; *Welch*, Day 7 Transcript at 12-17. While KC was sitting on a couch that he had previously used as a quiet space, Perry asked Welch if she could approach KC given that she (Perry) had been able to calm him during an outburst a few days earlier when he had thrown his glasses on the roof of the camp building. Hearing Decision at 27-28, ¶¶ 75-76; *Welch*, Day 7 Transcript at 18-19; *Mrs. C*, Day 7 Transcript at 124. Welch agreed, and Perry approached KC to ask if she could sit down. Hearing Decision at 28, ¶ 76; *Welch*, Day 7 Transcript at 19. KC agreed. *Id*. They began to talk, and KC asked Perry if he would be able to go to the mall. Hearing Decision at 28, ¶ 76; *Welch*, Day 7 Transcript at 19-20. She replied that she did not think so but was not sure. Hearing Decision at 28, ¶ 76; Record, Vol. II at 391. KC then began to hit Perry in

---

06 school year. Record, Vol. III at 902.

the ear and head with his hand, yelling that he wanted to go to the mall. Hearing Decision at 28, ¶ 76; *Welch*, Day 7 Transcript at 21. He then pivoted and kicked her in her upper arm with his feet several times. *Id*. Welch got Perry off the couch. *Id*. KC began to cry and removed his sock and shoe, biting his toe and yelling. *Id*. He also stuck his fingers in his mouth and tried to gag himself. Hearing Decision at 28, ¶ 76; *Welch*, Day 7 Transcript at 22. Once everyone was removed from the building, Welch phoned Mrs. C, who came to pick KC up. Hearing Decision at 28, ¶ 76; *Welch*, Day 7 Transcript at 22-24. Once KC was informed that his mother was coming, he calmed down. Hearing Decision at 28, ¶ 76; *Welch*, Day 7 Transcript at 24.

76.    KC returned to camp the next day remorseful and apologized to Perry. Hearing Decision at 29, ¶ 77; *Welch*, Day 7 Transcript at 32-33. Perry saw a doctor, who expressed some concern about bruising around her ear. Hearing Decision at 29, ¶ 77; *Welch*, Day 7 Transcript at 43.

77.    Mrs. C suggested that she believed Perry made an error in judgment by approaching KC when he was resting, which allowed events to spiral out of control. Hearing Decision at 29, ¶ 78; *Mrs. C*, Day 7 Transcript at 116, 131-32. Mrs. C agreed with the approach of using withdrawal of a mall trip as a consequence for poor behavior but felt that by invading KC's quiet space and then telling him he could not go, Perry had provoked KC. Hearing Decision at 29, ¶ 78; *Mrs. C*, Day 7 Transcript at 130-31. In the wake of the incident, Mrs. C blamed the Geren behavioral plan for weakening her son's coping mechanisms by essentially teaching him he was free to do whatever he wanted without consequence. *Mrs. C*, Day 7 Transcript at 119, 132-33.

78.    Geren found the June 29 assault to be functionally consistent with KC's prior aggressive behavior. Hearing Decision at 29, ¶ 79; *Geren*, Day 7 Transcript at 139. He testified that he believed that with modifications of the activities offered, his behavioral intervention plan could be used at STRIVE and probably would have prevented the assault. Hearing Decision at 29, ¶ 79; *Geren*,

Day 7 Transcript at 144-45.  He opined that the use of a verbal behavioral contract with KC was confusing for him due to his limited verbal skills.  Hearing Decision at 29, ¶ 79; *Geren*, Day 7 Transcript at 169-70.

79.     Geren testified that if KC returned to the Therapeutic Life Skills program in the fall, he would not likely adopt a plan that presented demands quickly and forcefully because KC had shown a willingness to use aggression to terminate a demand.  Hearing Decision at 29, ¶ 80; *Geren*, Day 7 Transcript at 152.  Instead, Geren would adopt an approach that gradually increased academic demands on KC.  Hearing Decision at 29, ¶ 80; *Geren*, Day 7 Transcript at 154-55.

80.     A due-process hearing was held in KC's case on May 30, June 1, June 8, June 15, June 27 and July 14, 2006.  Hearing Decision at 1.  By decision dated August 17, 2006 the Hearing Officer found that:

> A.     MSAD No. 6 violated the IDEA and Maine special-education law by failing to educate KC in the least restrictive environment from February 1-26, 2006, thus denying him a FAPE during that period.

> B.     MSAD No. 6 violated the stay-put provisions of the IDEA and Maine special-education law by not implementing the 2005-06 IEP from the time the family filed its request for a complaint investigation on February 21 until April 10, thus denying him a FAPE during that period.

> C.     KC was entitled to ten weeks of STRIVE camp as a compensatory-education remedy for those violations of the IDEA and Maine special-education law.

> D.     The 2006-07 IEP, as amended in April 2006 with a behavioral plan, was reasonably calculated to provide him with a FAPE in the Therapeutic Life Skills program at BEHS for the 2006-07 school year.

> E.     KC's PET should convene to consider minor modifications to the 2006-07 IEP recommended in the Hearing Decision.[25]

---

[25] The suggested minor modifications included continued access for KC to a quiet space free of all sensory stimuli for use as a time-out space, reduced dependency on KC's speech therapist for social interaction, and inclusion of all of his IEP activities, including cooking, in his array of choices under the behavior-intervention plan.  *See* Hearing Decision at 55-56. The parties have not made any issue of these suggested modifications in the instant appeal.  *See generally* Parents' Brief; District Brief.

*Id.* at 62.[26]

81.     The family chose not to send KC to BEHS for the 2006-07 school year, keeping him at home instead.  Parents' Brief at 19, ¶ 43; District Brief at 15.

## II. Proposed Conclusions of Law

1.      Congress enacted the IDEA to ensure that children with disabilities receive a FAPE. *See, e.g.*, 20 U.S.C. § 1400(d)(1)(A).  A FAPE consists of special education and related services that are provided to children with disabilities at public expense and under public supervision, in conformity with the child's IEP, during preschool, elementary school and secondary school.  *See id.* § 1401(9).  The states and "local educational agencies" located within them are responsible for ensuring that children with disabilities receive a FAPE.  *See, e.g., id.* § 1412-13.  In return, those bodies receive funds from the federal government for use in implementing the provisions of the IDEA. *See, e.g., id.* §§ 1412(a), 1413(a).

2.      A PET, consisting of a disabled child's parents, teachers, school administrators and others who know the child well, oversees the child's special education.  *See id.* § 1414(d)(1)(B); Maine Special Education Regulations, Code of Me. R. 05-071 ch. 101 ("MSER") § VI(2)(B).  The PET develops, reviews and revises as appropriate an IEP outlining the special-education services the child should receive.  *See* 20 U.S.C. §§ 1414(d)(3) & (4)(A).

3.      Per 20-A M.R.S.A. § 7207-B(2)(A), a parent, surrogate parent, guardian or school administrative unit may request the MDOE commissioner "to appoint an impartial hearing officer who

---

[26] The Hearing Officer found that the District had committed several serious procedural violations of the family's rights pursuant to the IDEA and Maine special-education law, for example, by neglecting to invite the family to the February 14 meeting with Geren despite Geren's express request that the family be present and by failing to notify the family that the March 6 PET meeting would be held despite the scheduling of mediation later in the day.  Hearing Decision at 36.  However, the Hearing Officer found that, given the family's overall level of input and involvement during the time period, the procedural violations did not significantly impede the family's ability to participate in the decision-making process.  *Id.* at 37-38.  The Parents do not challenge that decision in this appeal.  *See generally* Parents' Brief.

shall conduct a hearing regarding the identification, evaluation and educational program of the student and shall make findings of fact and issue a decision[.]"

4.      A party dissatisfied with the decision of an MDOE hearing officer may appeal that decision to the Maine Superior Court or the United States District Court. *Id*. § 7207-B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).

5.      The IDEA provides that a court reviewing the decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

6.      "The role of the district court is to render bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted).  "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court."  *Id*. (citations and internal quotation marks omitted).  *See also, e.g., Lamoine Sch. Comm. v. Ms Z. ex rel. N.S*., 353 F. Supp.2d 18, 29-30 (D. Me. 2005) ("The district court's standard of review is synthesized as follows: First, the Court carefully reviews the record of the due process hearing.  Second, appropriate deference is given the Hearing Officer and his expertise, particularly with regard to factual determinations.  Finally, the Court makes an independent decision whether the hearing officer's determination is supported by a preponderance of the evidence.") (citation and internal quotation marks omitted).

38

7.     The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise.  *See, e.g., Deal ex rel. Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP provides the hope of educational benefit.").  Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole."  *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)).

8.     In an IDEA appeal, two questions are presented: "First, has the State complied with the procedures set forth in the Act?  Second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  *Hampton*, 976 F.2d at 52 (citation and internal quotation marks omitted).

9.     The burden of proof rests on the party challenging the hearing officer's decision.  *Id.* at 54; *see also, e.g., Maine Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R.*, 176 F. Supp.2d 15, 23 (D. Me. 2001) (rec. dec., *aff'd* Feb. 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003) ("The party allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

10.     When a school violates the provisions of the IDEA in a manner that deprives a student of a FAPE, a court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).   Nonetheless, "[m]onetary recovery in such suits is limited to compensatory education and equitable remedies that involve the payment of money, such as reimbursements for educational expenses that would have been borne by defendants in the first instance had they properly developed and implemented an IEP." *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 19 (1st Cir. 2006).

11.     The Parents assert that the Hearing Officer erred in ruling that (i) the 2006-07 IEP, as amended in April 2006, was reasonably calculated to provide KC with a FAPE, (ii) after April 10, 2006, the District was not in violation of KC's stay-put rights, and (iii) the grant of ten weeks of STRIVE summer camp sufficed to remedy the educational injury the Hearing Officer found KC to have suffered.  *See* Parents' Brief at 19-34.  I consider each point in turn, concluding that the Parents' appeal should be granted as to the second two points but denied as to the first.

## A.  FAPE Issue

12.     In her decision, the Hearing Officer considered whether the 2006-07 IEP, as amended in April 2006, (i) denied KC a FAPE as implemented after April 10 (*ex post*) and (ii) was reasonably calculated to provide him with a FAPE for the 2006-07 school year (*ex ante*).  *See* Hearing Decision at 50-59.

13.     With respect to the first (*ex post*) inquiry, the Hearing Officer wrote:

Since the application of the behavioral plan, [KC] has been able to remain free of major incidents at school and has voluntarily utilized quiet space in order to calm himself.  With regard to his academic progress during the fourth quarter, although Dr. Lyons opined that [KC] regressed academically under the behavioral plan, his testimony pointed to no objective evidence to suggest that this was the case.  In fact, [KC] continued to make academic progress during the fourth quarter of the school year. He produced seventeen math assignments, with an average grade of seventy-two, and sixteen English assignments, with an average score of eighty, as well as several oral English assignments.

KC's progress on functional life skills during the fourth quarter is less identifiable. As noted earlier, [KC's] cooking supplies had been sent home on January 24 and the family was never notified that he could resume cooking. Instead, the family was informed when [KC's] lunch money ran low. [KC's] daily log sheets for this period reveal few instances where [KC] took part in cooking or used the appliances or the computer. [KC] did, however, undertake a functional math activity in time, money, or measuring nearly every day. Moreover, [KC] received several grades of "2" (indicating average progress) on his fourth quarter progress report. As such, [KC] received sufficient educational benefit during the fourth quarter to prevent him from being deprived [of a] FAPE.

*Id*. at 53-54 (citations and footnotes omitted).[27]

14.    In so finding, the Hearing Officer cited *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000), which she observed held that "a student does not have to progress in every area of IEP instruction in order to attain an educational benefit[.]" *Id*. at 54. Inasmuch as appears from my research, neither the Supreme Court nor the First Circuit has considered whether a claim of non-implementation of an IEP is cognizable under the IDEA. However, "the consensus approach to this question among federal courts that have addressed it has been to adopt a standard articulated by the Fifth Circuit in [*Bobby R*.]." *Catalan ex rel. E.C. v. District of Columbia*, 478 F. Supp.2d 73, 75 (D.D.C. 2007).

15.    The Parents contend that, on the strength of a misreading of *Bobby R.*, the Hearing Officer wrongly determined that progress in a single IEP goal (behavior) was sufficient to show that the 2006-07 IEP delivered KC a FAPE after April 10, 2006. *See* Parents' Brief at 22. The Parents argue that, instead, *Bobby R*. stands for the proposition that progress on all IEP goals and objectives is required. *See id*. Measuring indicia of KC's actual performance in the fourth quarter of the 2005-06 school year against goals laid out in his IEP, they contend that such progress clearly was not made,

---

[27] In a footnote, the Hearing Officer stated: "The family expresses concern that [KC] is no longer eligible to enter the PATHS off-site vocational cooking program in the fall because he did not undertake much cooking over the last half of the school year. Although [KC's] PET did not submit an application for him to take part in PATHS this fall, district witnesses testified persuasively that cooking in the classroom is not a prerequisite to the PATHS program and that if [KC's] PET believes that he is behaviorally prepared to (*continued on next page*)

noting, *inter alia,* that KC (i) failed to meet his cooking goals at all and used only two of six appliances, resulting in a grade of 1 (poor progress), (ii) regressed in two of three measurements of his reading/comprehension ability from the third to the fourth quarter, and (iii) made little to no progress toward his transition plan, pursuant to which he was to have engaged by fall 2006 in an interview with the Vocational Rehabilitation Service, a possible PATHS program, skills evaluation and a job shadow. *See id.* at 25-27.

16.      The District, for its part, counters that the Hearing Officer (i) correctly construed *Bobby R.* and (ii) reasonably determined that the 2005-06 IEP, as implemented for the very short period in question, provided him with a FAPE after April 10, 2006. *See* District Brief at 32-38. The District has the better of the argument.[28]

17.      In *Bobby R.*, the United States Court of Appeals for the Fifth Circuit endorsed the notion that "failure to provide all the services and modifications outlined in an IEP does not constitute a *per se* violation of the IDEA." *Bobby R.*, 200 F.3d at 349. It concluded:

> [T]o prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

---

undertake the program, the district will do its best to ensure that he is able to enroll." Hearing Decision at 54 n.11 (citations omitted).
[28] The District also argues that the Parents failed to raise any issue concerning KC's transition plan in proceedings before the Hearing Officer, thereby waiving any complaints regarding it. *See* District Brief at 24-25 n.14. I disagree. As the Parents correctly observe, *see* Parents' Reply Memorandum of Law ("Parents' Reply Brief") (Docket No. 29) at 4 n.5, KC's transition services were part and parcel of his IEP, the overall adequacy of which they clearly have challenged. In addition, during proceedings before the Hearing Officer, the Parents alluded to KC's transition services when they raised the issue that his prospects for attending the PATHS cooking program had been diminished. *See* Hearing Decision at 54 n.11; Record, Vol. I at 242 (noting possibility of attendance at PATHS in transition plan).

*Id*.  The court made clear – as the Hearing Officer noted it had – that "it is not necessary for [a child] to improve in *every* area to obtain an educational benefit from his IEP."  *Id*. at 350 (emphasis in original).

18.    The question posed by *Bobby R.*, therefore, is not whether the District failed to implement one or more elements of KC's IEP but rather whether it failed to implement "substantial or significant provisions" of it.  *Id*. at 349.  In the unique circumstances of this case, the District cannot reasonably be said to have failed to do so.  The 2006-07 IEP, as amended in April 2006, transparently elevated one goal – achievement of KC's behavioral objectives – to a position of preeminence, making clear that other IEP objectives were to yield if need be.[29]  While District staff encountered some initial difficulties in implementing that strikingly new approach, the District committed its resources to making it work, succeeding in implementing the behavioral plan fully (in the fashion envisioned by its architect, Mark Geren) within approximately a month-and-a-half of its inception.  When all was said and done, KC was judged at the end of the school year to have made above-average progress in his paramount goal (behavioral improvement), as evidenced by his score of a 3.  The Record amply bears out that the high mark was warranted.  KC exhibited only one instance of aggressive behavior – throwing his glasses – at BEHS once the plan was implemented.  There was anecdotal evidence that he was beginning to learn to calm and prepare himself prior to exciting or stressful events such as field trips.  When Mrs. C prevented KC's aides from implementing the

---

[29] Even assuming *arguendo* that the Parents correctly construe caselaw as holding that, to survive a challenge on grounds that an IEP was improperly implemented, a school must show that the student made progress on all IEP goals and objectives, *see* Parents' Brief at 22, the caselaw they cite is materially distinguishable inasmuch as none concerns an IEP calling for implementation of a continuous-choice behavior plan consciously designed to permit a student to choose not to work on other IEP goals, *see CJN ex rel. SKN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 634-36 (8th Cir. 2003); *Neosho R-V Sch. Dist. v. Clark ex rel. Clark*, 315 F.3d 1022, 1024-26 (8th Cir. 2003); *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Mr. & Mrs. Barry F.*, 118 F.3d 245, 248-52 (5th Cir. 1997); *North Reading Sch. Comm. v. Bureau of Special Educ. Appeals*, 480 F. Supp.2d 479, 481-84 (D. Mass. 2007); *Catalan*, 478 F. Supp.2d at 75; *Andrew B. v. Board of Educ.*, No. 05 C4959, 2006 WL 3147719 (N.D. Ill. Oct. 27, 2006).

behavioral plan at summer camp, a serious incident of aggression again occurred – one that Geren testified his behavioral plan might have averted.

19.     To the extent the Parents complain that, pursuant to the IEP as amended, certain of KC's other IEP goals were neglected, the IEP itself contemplated that this likely would occur.  What is remarkable in the circumstances is not that KC failed to make progress on some of his non-behavioral IEP goals or even regressed to some slight degree on some of them, but rather that he was able to make the degree of progress he did pursuant to a plan in which he was entirely free to choose non-IEP activities (such as relaxing on a beanbag chair or socializing) without negative consequence.

20.     At heart, as the District suggests, *see* District Brief at 27, the Parents' quarrel is with the necessity and the wisdom of the approach taken by the Geren behavioral plan – not with its implementation.  The Parents, who have never seen their son engage in aggressive behavior at home or in the community and feel that his aggression resulted from failings on the part of his teachers and aides, understandably take issue with the depth of the District's safety concerns.  Yet, in the wake of incidents in which KC hurled computer equipment to the floor (once in the vicinity of a classmate in a wheelchair) and struck a special-education teacher, the District understandably took the position that KC could not be educated (or be available for education) at BEHS in the absence of a comprehensive behavioral-intervention plan.  Indeed, BEHS school administration made reasonably clear that, were there to be a further occurrence such as the January 9 incident, KC no longer would be welcome at the school.  In short, the District made a reasonable judgment that, for KC, everything – functional-life skills, academic skills, transition planning – was secondary to and dependent upon bringing his infrequent yet dangerous aggressive behaviors under control.

21.     One could debate, as have the Parents, the merits of the Geren plan as a means of achieving that goal.  They and their expert, Dr. Lyons, perceive Geren's total-choice approach as

ultimately encouraging the very undesirable behaviors it was designed to abate (by teaching KC, unrealistically, that he can do whatever he wants without negative consequence) while simultaneously sacrificing progress on KC's functional-skills, academic and transitional goals. There is a certain logic to this concern. Yet the District's two expert witnesses, both well-qualified behavioral consultants, strongly defend this approach as state-of-the-art protocol. They make a compelling argument that, with patience, the total-choice approach is a more humane, safe and ultimately more successful means to reduce aggression in a child such as KC than a plan incorporating negative consequences. It is precisely in regard to disagreements over such sensitive and difficult methodological matters that courts are directed to refrain from substituting their preferred approach and defer to the decisions of educators and specialized hearing officers. *See, e.g., Board of Educ. v. Rowley ex rel. Rowley*, 458 U.S. 176, 206 (1982) (review of adequacy of IEP "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities"); *Mr. & Mrs. I v. Maine Sch. Admin. Dist. 55*, 416 F. Supp.2d 147, 156 (D. Me. 2006), *aff'd*, 480 F.3d 1 (1st Cir. 2007) ("Where the issue is one that implicates the educational expertise of the school district, more deference is due the administrative findings."); *Brougham ex rel. Brougham v. Town of Yarmouth*, 823 F. Supp. 9, 16 (D. Me. 1993) ("The [Supreme] Court clearly stated that once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States.") (citation and internal quotation marks omitted).[30]

---

[30] Beyond this, as the Hearing Officer observed, *see* Hearing Decision at 52, the IDEA does not provide a substantive standard for evaluation of a behavioral plan, *see, e.g., T.W. ex rel. McCullough v. Unified Sch. Dist. No. 259*, 136 Fed. Appx. 122, 129-30 (10th Cir. 2005) ("To the extent plaintiff argues that the BIP [behavioral intervention plan] is substantively deficient, he faces an uphill battle. Neither the IDEA nor its implementing regulations prescribe any specific substantive requirements for a BIP. Courts should be leery of creating such substantive requirements out of whole cloth where neither Congress nor the Department of Education, the agency charged with promulgating regulations for the IDEA, has done so.") (citations and internal quotation marks omitted); *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 615 (7th Cir. 2004) (same). This counsels even greater caution in disturbing the endorsement of the Geren total-choice behavioral plan. I find no caselaw considering whether an IEP incorporating a total-choice or continuous-choice behavioral plan suffices to confer a FAPE; however, the Parents' argument, if accepted and taken to its logical conclusion, would render any IEP incorporating such a behavioral plan vulnerable to a FAPE (*continued on next page*)

22.     Inasmuch as the 2006-07 IEP, as amended in April 2006, was (i) implemented substantially in the manner intended, (ii) the District reasonably adjudged KC to have made above-average progress pursuant to the Geren behavioral plan (the keynote feature of that IEP), and (iii) KC continued to make progress on other IEP goals, for example English, math and on-the-job training in the form of delivery of daily announcements at BEHS, the Hearing Officer supportably concluded that the 2006-07 IEP, as amended, conferred KC with a FAPE as implemented in the fourth quarter of the 2005-06 school year.

23.     The Parents next challenge the Hearing Officer's conclusion that the same IEP was reasonably calculated to confer KC with a FAPE going forward.  *See* Hearing Decision at 54-59; Parents' Brief at 30; Parents' Reply Brief at 2-7.  In so finding, the Hearing Officer rejected an argument by the Parents that their son could not successfully be educated at BEHS because of the strained relationship between the family and Turner.  *See* Hearing Decision at 56-59.

24.     The question whether, *ex ante*, an IEP is reasonably calculated to confer a student with a FAPE is analyzed somewhat differently than that whether, *ex post*, an IEP as implemented has conferred a FAPE.  *See, e.g., Ross ex rel. Ross v. Framingham Sch. Comm.*, 44 F. Supp.2d 104, 117 (D. Mass. 1999), *aff'd*, 229 F.3d 1133 (1st Cir. 2000) ("[A] claim about implementation is necessarily distinct from a claim that an IEP was not appropriate at the time that it was adopted (that is, from the '*ex ante*' perspective.)").

25.     For purposes of *ex ante* analysis, "a FAPE has been defined as one guaranteeing a reasonable probability of educational benefits with sufficient supportive services at public expense." *G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 948 (1st Cir. 1991).  "Generally speaking, the IDEA oblige[s] the School District to furnish [the student] with a FAPE sufficient to confer some educational

_____

challenge.

benefit." *Mr. & Mrs. R.*, 321 F.3d at 11 -12 (citing, *inter alia*, *Rowley*, 458 U.S. at 207); *see also, e.g., Nack ex rel. Nack v. Orange City Sch. Dist*., 454 F.3d 604, 614 (6th Cir. 2006) ("[T]he IDEA does not guarantee success – it only requires a school to provide sufficient specialized services so that the student benefits from his education.") (citation and internal quotation marks omitted).  As the First Circuit has further elaborated:

> The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents.  The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP.  Appropriateness and adequacy are terms of moderation.  It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.
>
> The IDEA also articulates a preference for mainstreaming.  Translated into practical application, this preference signifies that a student who would make educational progress in a day program is not entitled to a residential placement even if the latter would more nearly enable the child to reach his or her full potential.  And, moreover, when the bias in favor of mainstreaming is married to the concepts of appropriateness and adequacy, it becomes apparent that an IEP which places a pupil in a regular public school program will ordinarily pass academic muster as long as it is reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Lenn v. Portland Sch. Comm*., 998 F.2d 1083, 1086 (1st Cir. 1993) (citations and internal quotation marks omitted).  *See also, e.g., Milford Sch. Dist. v. William F*., No. 97-1506, 1997 WL 696108, at *5 (1st Cir. Nov. 10, 1997) ("A FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice, or even the best choice.") (citation and internal punctuation omitted).[31]

---

[31] The Parents posit that 1997 and 2004 amendments to the IDEA have rendered obsolete pre-2004 caselaw and raised the bar with respect to the FAPE standard.  *See* Parents' Reply Brief at 1-5.  For this proposition they rely heavily on *J.L. v. Mercer Island Sch. Dist*., No. C06-494P, 2006 WL 3628033 (W.D. Wash. Dec. 8, 2006), *corrected on recon. on other grounds*, 2007 WL 505450 (W.D. Wash. Feb. 10, 2007), in which the United States District Court for the Western District of Washington held that the FAPE standard set forth in *Rowley* had been superseded by the 1997 amendments to the IDEA, which set the bar higher than had the *Rowley* decision.  *See id*; *Mercer Island*, 2006 WL 3628033, at *4-*5.  The First Circuit has expressly rejected this precise argument.  *See LT. T.B. & E.B. ex rel. N.B. v. Warwick Sch. Comm*., 361 F.3d 80, 83 (1st Cir. 2004) ("This court has continued to apply the *Rowley* standard in cases following the 1997 amendments, as have several of our sister circuits.  And that is for good reason. (*continued on next page*)

26.     With respect to prospective application of the 2006-07 IEP, as amended, the Hearing

Officer found:

> Moving forward, at the start of the next school year, after a period free of serious disruptions, the plan would incorporate academic demands in a systemic manner with an ongoing functional behavioral assessment.  Mr. Geren believes that an immediate application of the full academic demands placed on [KC] prior to January 9 would likely trigger another violent outburst, ultimately resulting in a more restrictive placement for him.  Mr. Geren also eschews a plan that would provide more negative consequences, such as suggested by the family, as both inhumane and more likely to encourage problem behaviors.  David Lennox agrees with Mr. Geren's gradual and systemic approach to increasing academic demands as a commonly used procedure.

> As such, [KC's] current IEP, developed in January 2006 for use until January 2007, including its April 2006 amendment with the adoption of the Geren behavioral plan, is reasonably calculated to provide [KC] with FAPE during the 2006-2007 school year.

Hearing Decision at 54-55 (citations omitted).  This conclusion was correct.  The IEP in question was reasonably calculated to provide KC with a FAPE inasmuch as it incorporated a defensible and well-thought-out  approach to curb his aggressive behaviors while continuing to offer him choices that were to include other IEP-goal-related activities, with actual demands to be phased back in gradually as warranted by his behavior.  Pursuant to that IEP, KC was likely to receive "some educational benefit" in the sense that he likely would continue to learn inhibition against violent outbursts (which, as noted above, the IEP reasonably deemed of paramount importance) while making progress in many, if not all, other areas identified by the IEP.[32]

---

The *Rowley* standard recognizes that courts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods.") (citations omitted).  The Parents also cite *Winkelman v. Parma City Sch. Dist.*, 127 S. Ct. 1994 (2007), for the proposition that the combination of the 1997 and 2004 amendments superseded the *Rowley* standard.  *See* Parents' Reply Brief at 3 n.3.  However, the Court in the passage cited merely noted the unremarkable fact that *Rowley* happened to have construed the meaning of FAPE in the precursor statute to the IDEA.  *See Winkelman*, 127 S. Ct. at 2001.  The Court neither stated nor suggested that the standard set forth in the *Rowley* decision had been superseded by either the 1997 or the 2004 amendments to the IDEA.  *See id.*  My research discloses no case, from the First Circuit or elsewhere, holding that the 2004 amendments displaced the *Rowley* FAPE standard.

[32] What is more, Geren's May 26, 2006 modification of his plan to remove loud vocalizations from the category of environmental disruptions and hair stereotypy from the category of anxious behaviors increased the likelihood that KC would be adjudged sufficiently free of environmental disruptions and anxious behaviors to warrant reintroduction of scholastic demands.  Loud vocalizations comprised the entirety of environmental disruptions in which KC was noted to have engaged after April 10, 2006, and hair stereotypy (*continued on next page*)

27.     The Hearing Officer also supportably rejected the Parents' argument that the sour relationship between Turner and the family undermined the ability of the District to provide KC with a FAPE commencing in the fall of 2006.  *See* Hearing Decision at 56-59.  As the Hearing Officer observed, the touchstone in determining whether such hostility undermines a school's ability to confer a FAPE is whether the hostility impacts the student.  *See id*. at 58; *see also, e.g., Board of Educ. v. Illinois State Bd. of Educ.,* 938 F.2d 712, 717-18 (7th Cir. 1991) (district court correctly focused on impact of hostile school-parental relationship on child in concluding that state of relations between parents and school board guaranteed program's failure); *Greenbush Sch. Comm. v. Mr. & Mrs. K*, 949 F. Supp. 934, 941 (D. Me. 1996) ("Greenbush claims that the Hearing Officer unfairly focused on [the student's] parents.  This is not true.  He focused on the effect that the parents' hostility would have on [the student] if he remained at Dunn.").  The preponderance of the evidence suggested that KC himself maintained a cordial relationship with Turner.

28.     The Hearing Officer therefore correctly concluded that the 2006-07 IEP, as amended in April 2006, was reasonably calculated to confer KC with a FAPE.

## B.  Stay-Put Issue

29.     The Parents next challenge the Hearing Officer's conclusion that the District no longer was in violation of the so-called "stay put" provision after April 10, 2006.  *See* Parents' Brief at 30-32; Parents' Reply Brief at 8-9.  With certain exceptions, and unless the parties otherwise agree, the stay-put provision of the IDEA requires that a student remain in his "then-current educational placement" during "the pendency of any [administrative or judicial] proceedings conducted pursuant to [20 U.S.C. § 1415]."  20 U.S.C. § 1415(j); *see also* 34 C.F.R. § 300.518; MSER § XVI(20).  The parties have not otherwise agreed, and the District has invoked no exception to the stay-put

---

comprised the bulk of anxious behaviors in which he was noted to have engaged during that period.

requirement.[33]   As the Hearing Officer suggested, a stay-put inquiry does not entail consideration
whether the challenged program of instruction was adequate or wise, *see* Hearing Decision at 49;
rather, the touchstone is whether there was a fundamental change in, or elimination of a basic element
of, the student's educational program, *see, e.g., AW ex rel. Wilson v. Fairfax County Sch. Bd.*, 372
F.3d 674, 682 (4th Cir. 2004) (change in location in itself is not necessarily a violation of stay-put
requirement; however, "where a change in location results in a dilution of the quality of a student's
education or a departure from the student's LRE-compliant setting, a change in 'educational
placement' occurs") (footnote omitted); *DeLeon v. Susquehanna Cmty.  Sch. Dist.*, 747 F.2d 149, 153
(3d Cir. 1984) ("The touchstone in interpreting section 1415 has to be whether the decision is likely to
affect in some significant way the child's learning experience."); *Lunceford v. District of Columbia
Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C. Cir. 1984) (to show change in educational placement, parent
"must identify, at a minimum, a fundamental change in, or elimination of a basic element of[,] the
education program"); *Cavanagh v. Grasmick*, 75 F. Supp.2d 446, 468 (D. Md. 1999) ("[A]
fundamental change in, or elimination of a basic element of, the educational program, which adversely
affects the child's learning experience in a significant way, is what constitutes a 'change in educational
placement' for purposes of the IDEA.").

30.    The Hearing Officer found, and the parties do not dispute, that as of the time the Parents
filed a request for a complaint investigation on February 21, 2006, invoking KC's stay-put rights, his
"then-current educational placement" was the 2005-06 IEP.  Hearing Decision at 44, 45 n.7, 47;
Parents' Brief at 30-32; District Brief at 40-42.[34]

---

[33] As the Hearing Officer pointed out, *see* Hearing Decision at 45 n.8, the District did not invoke a stay-put exception that pertains
when, *inter alia*, a child "has inflicted serious bodily injury upon another person while at school, on school premises[,]" 20 U.S.C. §
1415(k)(1)(G)(iii).  Nor does the District invoke that or any other exception to the stay-put requirement in the instant appeal; rather, it
argues that the program offered to KC after April 10, 2006 did not violate that requirement.  *See* District Brief at 40-42.
[34] As a threshold matter, the Hearing Officer correctly determined that KC's "educational placement" for stay-put purposes was not
(*continued on next page*)

31.     She went on to determine that after April 10, 2006, (i) "many of the services and programming detailed in [the 2005-06] IEP [were] restored" to KC, (ii) although application of his behavioral plan decreased his academic output at least temporarily, he was offered most of the programming in his IEP with the exceptions of cooking and mainstream art, (iii) he was included on field trips and in the Special Olympics, (iv) he delivered announcements on a daily basis, and (v) he began to spend increasing periods of time in Room 120, necessarily increasing interaction with his special-education peers.  Hearing Decision at 50.  Accordingly, she concluded, KC's programming after April 10 was substantially similar to the agreed-upon placement and did not work a violation of his stay-put rights.  *See id*.

32.     The Parents disagree, asserting that implementation of the Geren plan brought sweeping changes, "including a different location, different educational focus, different point on the LRE continuum and the ability to freely choose all activities."  Parents' Brief at 31 n.15; *see also* Parents' Reply Brief at 8 ("[O]nce the Geren plan was implemented, KC chose to spend less time on educationally related activities while at school.  As such, his program was diluted.  In addition, his access to the special education classroom (Room 120) occupied by other students was reduced.").

33.     Implementation of the Geren plan did not effectuate changes quite as sweeping as the Parents claim.  After April 10, as he had prior to the January 9 incident, KC began his day in Room 120, was assigned to the same special-education teacher (Turner), worked with at least some of the same educational technicians (such as Leavitt), opted to work in spaces other than Room 120, received speech and occupational-therapy services, went on field trips, delivered announcements and undertook some work on academic subjects (reading, writing and math) and functional life skills (such as time calculation).  Nonetheless, the Parents are correct that the program offered to KC after April

---

the physical space known as Room 120, but rather the constellation of programming and services contained in his 2005-06 IEP.  *See* (*continued on next page*)

10 differed materially, both as designed and as actually implemented, from that offered pursuant to the last-agreed-upon IEP.

34.     The 2006-07 IEP, as amended to add the Geren behavioral plan, represented a fundamental shift in philosophy and approach from that reflected in the more garden-variety 2005-06 IEP in place at the time of the January 9, 2006 incident.  The 2005-06 IEP contemplated that KC would be taught special-education life-skills and academic subjects via direct instruction by the special-education teacher and a one-on-one educational technician in three eighty-four-minute blocks a day and participate in mainstream classes for twenty-five percent of his day.  By contrast, the 2006-07 IEP, as amended to add the Geren plan, empowered KC to choose in five-minute intervals (later extended to fifteen minutes) the activities in which he would engage, whether IEP-related or not.

35.     Unsurprisingly, KC's programming as actually implemented after April 10, 2006 also differed substantively than the program outlined in the 2005-06 IEP.  He received significantly less mainstream education than contemplated in that document: He was barred from attending mainstream art and frequently opted not to attend gym class.  While it is difficult to assess the precise amount of special-education instruction he received in functional life skills and academics during the period after April 10, it is fair to say it was significantly less than the three daily eighty-four-minute blocks of such instruction prescribed in the 2005-06 IEP.  He received no instruction at all in cooking and chose not to receive instruction in use of most appliances.  He did undertake some math and English work, but his written output in those subjects was essentially halved.  He seldom chose to use the computer.

36.     While I find no case considering whether adoption of a continuous-choice behavior plan effects a change of placement for stay-put purposes, relevant caselaw suggests that the last-agreed upon placement must be offered substantially whole (with only minor variations) to pass muster.  *See,*

---

Hearing Decision at 48; *see also, e.g., AW*, 372 F.3d at 682.

*e.g., AW,* 372 F.3d at 683 (no change in placement when program to which student was transferred was materially identical in its educationally offerings and student would be placed in an identical setting); *Grasmick*, 75 F. Supp.2d at 468 (no change in placement on basis of three minor modifications to student's schedule – addition of reading objective to IEP, transfer from one class to another, and rendering of participation in field trips optional –when goals and objectives of IEP otherwise remained same); *see also DeLeon*, 747 F.2d at 153 ("[G]iven the remedial purposes of the [IDEA], the term 'change in educational placement' should be given an expansive reading, at least where changes affecting only an individual child's program are at issue.") (footnote omitted).  In the circumstances, the Hearing Officer erred in deeming the program provided to KC after April 10 "substantially similar to the last agreed-upon placement."  Hearing Decision at 50.

37.     The Parents request an award of compensatory education for KC as a result of the continuing stay-put violation.  *See* Parents' Brief at 34.  If the court concurs that the Hearing Officer erred in finding no stay-put violation after April 10, 2006, such an award would be appropriate.  *See, e.g., Sammons ex rel. A.S. v. Polk County Sch. Bd.*, No. 804CV2657T24EAJ, 2005 WL 2484640, at *7 (M.D. Fla. Oct. 7, 2005), *clarified on other grounds*, 2005 WL 2850076 (M.D. Fla. Oct. 28, 2005) ("Compensatory education is available as a remedy for a violation of the stay-put provision.").  Compensatory education is an equitable remedy; "[t]here is no obligation to provide a day-for-day compensation for time missed."  *Parents of Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1497 (9th Cir. 1994).  "Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA."  *Id*.; *see also, e.g., Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 833 (D.C. Cir. 2006) ("When a school district deprives a disabled child of FAPE in violation of IDEA, a court fashioning 'appropriate' relief under 20 U.S.C.

§ 1415(i)(2)(C)(iii) may order compensatory education, i.e., replacement of educational services the child should have received in the first place.") (citation and internal punctuation omitted).

38.     While the Parents prefer that the court "award compensatory education of an amount and type sufficient to remedy the significant educational losses that KC has endured[,]" Parents' Brief at 34, I agree with the District that remand to the MDOE is the wiser course of action, *see* District Brief at 44; *see also, e.g., Mr. & Mrs. R.*, 321 F.3d at 20 ("If the district court does not believe that the record is sufficient to permit it to make the highly nuanced judgments necessary to resolve the claim for compensatory education, it may remand the matter for further administrative adjudication."); *Ms. K v. Maine Sch. Admin. Dist. No. 40*, Civil No. 06-42-P-H, 2006 WL 3081555, at *14 (D. Me. Oct. 26, 2006) (rec. dec., *aff'd* Nov. 16, 2006) (noting that, while court had option of conducting additional proceedings itself in order to supplement the record and deciding matters independently, remand to MDOE hearing officer was advisable in part "because an award of reimbursement for special services or some form of a compensatory education, if any is called for, would be equitable in nature and would require consideration of various factors that were not previously addressed by the hearing officer and are not readily ascertainable by this Court on the existing record and briefs"). While it is clear that, after April 10, 2006, KC continued to be offered a program materially different than that contained in the 2005-06 IEP, the Record yields little insight into the extent to which that programming shift harmed him educationally or the manner in which such harm might be remedied. Moreover, the court has no expertise in types or amounts of educational programming available to remedy certain deficiencies, and the Parents proffer no concrete suggestions. *See* Parents' Brief at 34. In the circumstances, should the court agree that the Hearing Officer erred in finding no stay-put violation after April 10, 2006, I recommend that it remand this case to the MDOE for purposes of

assignment to the Hearing Officer (or another hearing officer) to determine the compensatory education to be awarded KC on account of violation of his stay-put rights after that date.[35]

### C. Compensatory-Education-Award Issue

39.      I come to the Parents' final issue: whether the compensatory education the Hearing Officer did order for the violations she found was adequate.  *See* Parents' Brief at 32-34.  The Hearing Officer ordered the District to provide KC with ten weeks of STRIVE summer camp to compensate him for the nine-and-a-half weeks between February 1 and April 10 that she found he was denied a FAPE (including periods during which he was removed from school).  *See* Hearing Decision at 61.  She observed: "This form of compensatory education will particularly provide [KC] with interaction with peers that he was denied during the period he was denied FAPE."  *Id.*

40.      The Parents assail this award as inadequate on grounds that, (i) as indicated by Drs. Pershouse and Lyons, KC required more than ten weeks' compensatory education to offset the losses he suffered through April 10, 2006, and, (ii) in any event, programming offered by the STRIVE camp offered virtually no opportunity for KC to progress on IEP goals such as academics and transition. *See* Parents' Brief at 33-34.

41.      The Parents mistakenly attribute Dr. Lyons' testimony to Dr. Pershouse, who offered no testimony on the subject of educational losses suffered by KC.  *See Pershouse*, Day 1 Transcript at 104-52.  With respect to Dr. Lyons' opinion, the Hearing Officer acted well within her discretion in

---

[35] The Parents seek an award of compensatory education running from April 11, 2006 to the present. *See* Parents' Brief at 31.  The District rejoins that it should not be faulted through a compensatory-education order for the family's refusal to let KC attend school in 2006-07, especially given the appropriateness of the program the family was rejecting. *See* District Brief at 43 n.24.  While the stay-put provision *permits* an award through "the present" – that is, through the conclusion of the instant judicial proceedings, *see, e.g.*, 20 U.S.C. § 1415(j); *Diaz-Fonseca*, 451 F.3d at 32 n.23 (1st Cir. 2006) – it does not *compel* such an award.  Compensatory education is an equitable remedy; accordingly, equitable considerations, including the conduct of the parties, bear upon the scope of relief to be awarded. *See, e.g., id.; Student W.*, 31 F.3d at 1496.  Inasmuch as the Record is barren of any evidence concerning the Parents' decision to refrain from sending KC to BEHS during the 2006-07 school year, this timing issue should form part of the compensatory-relief question to be determined by an MDOE hearing officer on remand.

declining to embrace it: Dr. Lyons offered no concrete basis for his belief that KC had lost a year's worth of education. *See Lyons*, Day 1 Transcript at 176-79.

42.     Nonetheless, the Parents make a compelling argument that the STRIVE program did not adequately compensate for the full scope of harm caused by the identified violations.  While the restrictiveness of KC's settings (first in the red portable, then in Room 120A) led in large measure to the Hearing Officer's finding that the District had violated KC's educational rights for the period through April 10, 2006, she identified at least one other significant shortcoming: that KC did not "perform many of his life skills related to cooking and shopping" during that period.  Hearing Decision at 48.  There is no evidence of record from which one reasonably could infer that the STRIVE program afforded KC training in those sorts of functional life skills.  Further, KC received no services at all during the two periods prior to April 10, totaling twenty-two school days, when his parents kept him home from school either at the school's request or out of frustration.  In weighing the equities of the situation, the Hearing Officer reasonably chose not to fault the Parents for removing KC during those two time frames; she found him entitled to compensatory educational relief for the entire period in issue.  *See* Hearing Decision at 61.  The award of STRIVE summer camp accordingly was inadequate to remedy the full scope of harm found.  *See Branham ex rel. Branham v. Government of D.C.*, 427 F.3d 7,  9 (D.C. Cir. 2005) ("[T]he ultimate compensatory award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.  Unlike ordinary IEPs that need only provide some benefit, compensatory awards must do more – they must *compensate*.") (citations and internal punctuation omitted) (emphasis in original).

43.     As before, I recommend that, if the court concurs that the  STRIVE award was insufficient to remedy violations the Hearing Officer found for the period prior to April 10, 2006, it

remand this case to the MDOE for purposes of assigning it to the Hearing Officer (or another hearing officer) to craft an appropriate supplemental compensatory-education award covering that time period. The Parents (again) offer no concrete suggestions, *see* Parents' Brief at 34, and the court is ill-equipped to devise a remedy from wholecloth or, even were it to hold an evidentiary hearing, to make the nuanced judgments necessary to award appropriate compensatory education.

### III.  Conclusion

For the foregoing reasons, I recommend that the instant appeal be **GRANTED** to the extent the Parents contend that the Hearing Officer erred in (i) finding no denial of KC's stay-put rights for the period commencing after April 10, 2006 and (ii) awarding a compensatory-education remedy for violations of KC's rights during the period prior to April 10, 2006 that did not address the full scope of injuries found, and otherwise **DENIED**.  Should the court agree that the Hearing Officer erred in either or both respects, I further recommend that the case be remanded to the MDOE for assignment to the Hearing Officer (or another hearing officer) to determine an appropriate supplemental compensatory-education remedy.

### ***NOTICE***

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 28th day of November, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge